[Criminal No. 344.   Filed September 23, 1915.]

[151 Pac. 952.]

WILLIAM FALTIN, Appellant, v. STATE, Respondent.

1. CRIMINAL LAW—TRIAL—INSTRUCTIONS—CONSTRUCTION.—Instructions must be construed together; error cannot be predicated upon an isolated portion of them, the misleading tendencies of which are cured by other portions.

2. CRIMINAL LAW—TRIAL—LANGUAGE OF COURT—CURE BY INSTRUCTION. In a prosecution for murder, where the court, as an introductory explanation of the meaning, purpose, and use of circumstantial evidence, read an extract from East's Pleas of the Crown to the effect that circumstantial evidence is not subject to falsification, as is direct testimony, thereafter in the charge emphasizing to the jury the necessity that for a conviction the circumstantial evidence must exclude every other hypothesis than that of guilt to a moral certainty, and that the facts proven must not only be consistent with guilt, but inconsistent with innocence, etc., such charge prevented the improper extract, unwarranted as an instruction because of its abstractness, from resulting in harm to the accused, and there was no error.

3. WITNESSES—DISREGARD OF TESTIMONY.—Before the jury are justified in disregarding all the testimony of a witness who has given false testimony they must be satisfied that such false testimony was given on a fact material to the issue on trial, willfully, by a witness knowing its falsity.

4. CRIMINAL LAW—TRIAL—INSTRUCTIONS.—In a prosecution for murder, where the court charged that, if the jury believed any witness had testified falsely, they might disregard his testimony, excepting so far as it might be corroborated by the testimony of other credible

evidence, following such instruction with another that, if the jury believed that any witness had willfully sworn falsely as to anything material to the issues, they might disregard his entire testimony, except as corroborated by other evidence or facts and circumstances proved on the trial, and thereafter charged that, if the jury believed any witness had willfully testified falsely as to any material fact, they could disregard his testimony, except in so far as it might be corroborated by other credible evidence, the error in the first charge, as not stating that the false testimony must have been given concerning a fact material to the issue, and by the witness willfully knowing it to be false, was cured by the second instruction, while such second instruction, incorrect by failing to state that the testimony must be corroborated by other credible evidence, was cured by the third.                    .                    .

5. HOMICIDE—TRIAL—INSTRUCTION.—In a prosecution for murder, where, under the facts of the case, no verdict of manslaughter could properly stand because there was no evidence to support such a charge, the defense claiming that the killing was by a third person, and there being no evidence of sudden quarrel or heat of passion between the defendant and the deceased, an instruction precluding a conviction of manslaughter was proper.

6. HOMICIDE—TRIAL—INSTRUCTION—ABSTRACTNESS.—In a prosecution for murder, where, under the facts of the case, no verdict of manslaughter could stand, the defense claiming that a third person killed deceased, there being absolutely no evidence of a sudden quarrel or heat of passion between the parties, the court properly refused a requested charge on manslaughter, through killing in a sudden heat of passion, as abstract.                    .

7. HOMICIDE—TRIAL—INSTRUCTION—MISLEADING QUALITY.—In a prosecution for murder, where an instruction requested was that, though the jury might find that the defendant killed deceased, and further find that such killing constituted murder, nevertheless, if they found from the evidence that the killing was done in a sudden heat of passion during a quarrel between the parties, and done without the defendant having formed a willful, deliberate and premeditated intent to take the life of deceased, then they could not find the defendant guilty of murder in the first degree, was properly refused, as calculated to mislead the jury to believe that the deliberate and premeditated design to kill cannot be formed in heat of passion or on a sudden quarrel, and that, in order to form a deliberate intention, time in which to form that design must be shown.

[As to homicide committed in blood-hot passion, see note in 134 Am. St. Rep. 730.]

8. HOMICIDE—MURDER—INTENT—KILLING IN PASSION.—No appreciable length of time is required to exist for deliberation and premedita-

tion in forming the intent to kill which will render a homicide murder.

9. CRIMINAL LAW—TRIAL—INSTRUCTION—ABSTRACTNESS.—In a prosecution for murder, where there was no suggestion in the evidence that certain witnesses were accomplices of the accused, a requested instruction that their testimony, adverse to him, should be corroborated before conviction. could be had, was properly refused as abstract.

10. CRIMINAL LAW—TRIAL—INSTRUCTION—ABSTRACTNESS.—In a prosecution for murder, where there was no issue in the evidence as to the voluntary nature of statements made by accused to officers, a requested instruction that such statements must have been voluntarily made, without influence of hope or fear, was properly refused as abstract.

11. CRIMINAL LAW—EVIDENCE—CONFESSIONS—WEIGHT—QUESTION FOR JURY.—In a criminal prosecution, the weight and credibility of confessions are to be determined by the jury under all the circumstances of the case, and the court should express no opinion as to their weight.

APPEAL from a judgment of the Superior Court of the County of Maricopa, J. C. Phillips, Judge. Affirmed.

STATEMENT OF FACTS BY THE COURT.

The appellant is charged and convicted of the willful and deliberate murder of Carl Peterson, committed on the ninth day of September, 1912, by crushing his head with an iron bar or other blunt instrument. The jury returned a verdict of guilty of murder of the first degree and fixed the punishment at death.

Briefly, the circumstances relied upon for a conviction are as follows:

Appellant bought and moved on a tract of land in the early part of the year 1912. The place is situate south of the city of Phoenix, and adjoins on the west a continuation of Seventh street, a street of the city. Adjoining the Faltin tract is the Pomero tract, of about the same size. The houses of Faltin and Pomero are near each other—about 200 feet apart. Along the east side of Seventh street, on Faltin's ground, the surface drops down several feet, called by the witnesses "the river-bed," evidently having been caused from the river wash at high stages, but at low or normal stages the lower

lands form what is sometimes called a "first bottom" of the river. Between the Seventh street line and the line of the declivity is several yards distance.

Faltin lived on his farm alone, until during June, 1912, Carl Peterson came from the hospital, where he had been sick, and lived with Faltin until September 9, 1912, when he disappeared. Before Peterson came to the Faltin place to live Faltin said to his neighbor, Pomero, that he (Faltin) believed that Peterson would die, that he would not get well, and that he (Faltin) had better go to Glendale and get a wagon and team belonging to Peterson and have them in his possession in case Peterson died. Faltin deposited $1,400 in a bank in July, and during the month drew out all but $2.90. This money he paid on the purchase price of his land and for other necessary tools and machinery. In April, July and August Peterson gave him checks for small amounts. Faltin, worked at times teaming. When arrested Faltin had in his possession $137 in cash, largely gold coin. On September 1st Peterson drew from the Glendale bank $288.10. Faltin, on Saturday before the twelfth day of September, 1912, failed to pay his note due on the 1st of September, stating that he did not have the money, but that he would have the money by the 12th of September. The note was given for the purchase price of machinery. When the machinery was purchased, Peterson was in the hospital sick, and Faltin paid $50 cash, and told the seller that he had no more money at that time, but he had a friend who was sick who had lots of money, and when the friend got well he could get the money.

Between the hours of 2 and 3 o'clock A. M. of the 9th of September, 1912, Pomero and his wife heard Peterson screaming and calling Pomero for help. They dressed, but made no light, and did not then go to his assistance, as they heard no further noises. A few minutes later Faltin came near their house and asked Pomero if he wished to use the irrigating water, as it was then running. Pomero did not wish the water, and Faltin returned to his house and made a light. Then a wagon left his premises and was gone a short time, and later returned; then left again, and seemed to travel toward Phoenix. Faltin returned to his house with a wagon at about 6 o'clock in the morning. Pomero left about that

time for the city, as was his custom, to get swill for his hogs.
As he was going by Faltin's premises Faltin told him Peterson had gone away to the mines early that morning and
would not be back for a few days.   While Pomero was gone
Faltin got a few buckets of water and a broom and went in
his house and scrubbed on the steps and on a bridge.   He
went to a water-closet twice, and then took a pitchfork and
threw a little hay near the door of his house.   He took the
pitchfork and went near a haystack standing near the declivity along Seventh street and pitched hay or rubbish for
a few minutes and returned to his house.   Then he went to
Pomero's house and asked Pomero's wife if they heard noises
at his (Faltin's) house that night when Peterson went away.
She denied having heard noises there.   Later Faltin went
away and met an officer, who placed him under arrest.   An
examination of the Faltin house revealed quantities of blood
stains on the floor and on a cot occupied by Peterson as a
bed.   Blood stains on the steps of Faltin's house, and pools
of blood and brains, a large bar of iron, a part of a plow with
blood, brains and light-colored hair on it, and a piece of
bloody wood were found near the front door of the house.
The pools of blood and the iron and wood were covered with
hay lately thrown over them.   A pair of bloody overalls and
a shirt belonging to Faltin were found in the vault of a
privy.   Faltin told the officer who arrested him that Peterson had gone to the mines and would not return for three
days.   He told the same story to another witness in the jail.
On Friday, prior to Monday, the 9th of September, Faltin
was digging a hole between the declivity and his Seventh
street line.   On the early morning of the 9th he caused a load
of garbage to be dumped where he had been digging on Friday.   The officers searched for the body of Peterson, without
success, until the 12th of September, when it was uncovered
at the place Faltin had been digging and had caused the
garbage to be dumped.   When found, the head was crushed,
one arm broken, and many bruises appeared on the body.
Peterson's hair was of a light-brown color and of the color
of the hairs found on the piece of iron.

   After the accused was arrested he was given a close physical examination for wounds.   The arresting officers found a
blood splotch on his chest.   Later on examination a wounded

finger was found, and that wound was healing. No other wounds were found on his body. After the body was found Faltin told a fellow prisoner, one Beckton, the circumstances of the killing. Other prisoners heard part of the story.

The accused made his statement of the matter as a witness. The substance of his statement was to the effect that on the night in question a clock had sounded an alarm, and had awakened Peterson. This had irritated Peterson, and Faltin and Peterson had words over the matter, Peterson accusing Faltin of having purposely set the alarm to annoy him, and Faltin claiming to have set the alarm on the time he expected the irrigation water to reach his farm. A few minutes later Pomero and two of his Italian friends came in the room and demanded that Faltin permit them to use the irrigating water, and over this a dispute arose between Faltin and the Italians. During the dispute, while Peterson was yet in bed, he remarked that someone should kill Faltin, and immediately Pomero and his two friends began a fight with Faltin. They got Faltin to the floor in a corner twice, and dazed him by hitting him over the head a number of times with a club. Finally he escaped by jumping over Peterson's cot and going out into the yard. Here he stumbled into a ditch and fell. While lying in the small ditch, slightly on one side, Peterson appeared over him, holding him down, and called for Pomero by name of "Nick" to come and help him. Then Peterson got accused's finger in his mouth and held it there. Pomero and his friends came to the assistance of Peterson, and Pomero had the piece of iron in his hands and began to strike Peterson over and about the head with the iron, causing the blood and brains to splash over Faltin, some blood going into Faltin's mouth and over his clothes. After Pomero struck several blows, Peterson appeared to be dead, and then Faltin, with the assistance of some of the others, placed the body on blankets or a piece of canvas and carried it out among the sunflowers and weeds, and wrapped it up and left it there. Pomero and his friends told the accused if he reported on them they would kill him. One of the party went with the accused up to the city until the accused got a remedy at a drug-store for his many wounds, and also got two cigars. They started back, and when they had gone a short distance the man left the wagon,

and accused returned home. When he returned to the house he scrubbed the floor and the step with a wet gunny-sack to remove the blood stains. He threw the overalls and the shirt in the privy. He scrubbed the blood from the bridge. He covered the blood pools and piece of iron and wood with hay. He went to the haystack and threw rubbish about, and when the garbageman came along with a load of garbage he had the man dump that where he expected to fill up the declivity. He stated that he was using a shovel on Friday, before Monday, the 9th, but he was throwing dirt over the paper dumped there, so that the garbageman would not be afraid to drive over it with a load. Accused said he told the officers and the prisoners that Peterson had gone to the mines and would not return for several days, and admitted that statement was untrue, but that he made the statement through fear of the Italians.

The transcript of the reporter's notes of the oral testimony taken in the case is voluminous, and many details appear there which are not mentioned in this statement, but the essential important facts relied on by the appellant and by the respondent appear. Such minor details that are important appear in the opinion. The verdict was received, and judgment of conviction followed, and the death penalty and execution fixed. The time fixed for execution has long since expired. From the judgment of conviction and from an order refusing a new trial this appeal is prosecuted.

Messrs. Struckmeyer & Jenckes, for Appellant.

Mr. Geo. P. Bullard, Attorney General, and Mr. Leslie C. Hardy, Assistant Attorney General, for the State.

CUNNINGHAM, J.—The appellant complains of certain instructions given the jury by the court; of the refusal of the court to give instructions requested by the appellant; of the order refusing a new trial; of the denial of challenges of jurors; of the admission of evidence; of the rejection of evidence offered; of the introduction of certain testimony because the witness had been convicted of a felony; of the misconduct of the prosecuting attorney, and the misconduct of the judge during the trial.

The first instruction attacked by appellant is stated to be "not an 'instruction,' being a mere philosophical speculation and argument, and caused the jury to place too great a reliance upon the circumstantial evidence adduced, and accord it too great weight."

The court, as an introductory explanation of the meaning, purpose, and use of circumstantial evidence, read as a part of his instructions from East's Pleas of the Crown, as follows:

"Experience has shown that circumstantial evidence may be offered in such a case; that is, that a body of facts may be proved of so conclusive a character, as to warrant a firm belief of the fact, quite as strong and certain as that on which discreet men are accustomed to act, in relation to their most important concerns. It would be injurious to the best interests of society if such proof could not avail in judicial proceedings. If it was necessary always to have positive evidence, how many criminal acts committed in the community, destructive of its peace and subversive of its order and security, would go wholly undetected and unpunished? The necessity, therefore, of resorting to circumstantial evidence, if it is a safe and reliable proceeding, is obvious and absolute. Crimes are secret. Most men conscious of criminal purposes, and about the execution of criminal acts, seek the security of secrecy and darkness. It is therefore necessary to use all other modes of evidence besides that of direct testimony, provided such proofs may be relied on as leading to safe and satisfactory conclusions; and, thanks to a beneficent Providence, the laws of nature and the relations of things to each other are so linked and combined together that a medium of proof is often thereby furnished leading to inference and conclusions as strong as those arising from direct testimony.

"On this subject I will once more ask attention to a remark in the work already cited, East's Pleas of the Crown, c. 5, II: 'Perhaps,' he says, 'strong circumstantial evidence, in cases of crimes like this, committed for the most part in secret, is the most satisfactory of any form whence to draw the conclusions of guilt; for men may be seduced to perjury by many base motives, to which the secret nature of the offense may sometimes afford a temptation, but it can scarcely happen that many circumstances, especially if they be such

over which the accuser could have no control, forming together the links of a transaction, should all unfortunately concur to fix the presumption of guilt on an individual, and yet such a conclusion be erroneous.'

"Each of these modes of proof has its advantages and disadvantages; it is not easy to compare their relative values. The advantage of positive evidence is that it is the direct testimony of a witness to the fact to be proved, who, if he speaks the truth, saw it done; and the only question is whether he is entitled to belief. The disadvantage is that the witness may be false and corrupt, and that the case may not afford the means of detecting his falsehood."

The instruction is simply a part of a discourse upon the different technical classes of evidence—direct and circumstantial. The different classes are explained and compared and their reasons for existing referred to and explained. The writer speculates, in support of the existence of and recognition of the two classes of evidence, as to the possibilities of each when followed, leading to the truth, and suggests that circumstantial evidence has a greater claim to leading correctly to the desired goal than direct evidence, because circumstances in evidence are less liable to be subject to change than direct evidence; that direct evidence depends upon the truth of the witness stating it, while circumstances are fixed witnesses, inanimate in their nature, and the language they speak, when once known, cannot be affected, changed or shaded. Such is the nature of circumstantial evidence that, although by perjury any particular circumstance may be eliminated from the case, yet no perjury can affect a circumstance as a link binding the perpetrator of a crime to his criminal acts. Whether the circumstance exists as a fact may be and is a serious question in most cases, but in this case no such question can arise. The accused has admitted in his own personal testimony the existence of every circumstance relied upon by the prosecution for a conviction. The accused has admitted his presence at the place and at the time of the homicide. He has stated that the deceased met his death from the identical weapon which the prosecution claims caused his death. He has admitted that the death was caused under such circumstances as makes the perpetrator guilty of murder. He has admitted his connection with the

digging in the ground at the place the body of deceased was found buried. His connection with that place was prior to the homicide in digging a place to receive the body, and after the homicide he admits he was there throwing garbage over the place where the body was later found buried. He admits that he made untrue statements of the disappearance of the deceased. All these matters were circumstances in evidence, and their existence is not in dispute. The only question of dispute in the case was whether Faltin killed Peterson with the iron bar, or whether Pomero killed Peterson with the iron bar. If Pomero killed Peterson, as Faltin says he did, then Faltin has committed no crime, and the incriminating circumstances in evidence connecting Faltin with the commission of the homicide are fully explained to his advantage. If Pomero did not kill Peterson, then the circumstances in evidence point to Faltin and to no other person, as the one who committed the crime after a well-matured design to kill and dispose of the body. The only explanation of the incriminating circumstances made by Faltin turns upon the truth or falsity of Faltin's evidence of who actually struck the blows that killed Peterson. If Pomero did not strike the blows, as Faltin claims he did, then Faltin has made no satisfactory explanation of his actions leading up to the time of the killing and following immediately thereafter. His acts are unexplained in any other contingency than that Peterson was actually killed by Pomero while Pomero and his friends were trying to kill Faltin. The jury had both direct evidence of the manner and means of the homicide, and they had direct and circumstantial evidence of the identity of the perpetrator of the crime. Who was that perpetrator was the vital question of fact for the jury's determination. The record standing in such condition, the court undertook to explain to the jury why both kinds of evidence are competent to establish the facts for which offered.

Following immediately the discourse above complained of, the court says:

"The circumstances, taken together, should be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused, and no one else, committed the offense charged. It is not sufficient that they create a

probability, though a strong one; and if, therefore, assuming all the facts to be true which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of the accused, the proof fails. It is essential, therefore, that the circumstances taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis.''

Later in the instruction, after saying that the evidence relied upon by the state is circumstantial evidence, the court says:

''And the state seeks to connect the defendant with the crime by showing a chain of circumstances leading up to it and connected with it and the defendant, and this circumstantial evidence. And I will say to you that the evidence which has been received in this case is legal and competent, and if it is, in your mind, of such a character as to exclude every reasonable theory or hypothesis other than that of the defendant's guilt, beyond a reasonable doubt, then and in that event it should be given the same weight by you as would direct evidence of the fact alleged. Circumstantial evidence, when competent and when complete and satisfying to your mind, as has been charged, is entitled to the same weight that direct evidence is.''

Then later in the instruction the court says:

''The value of circumstantial evidence depends upon the conclusive nature and tendency of the circumstances relied on to establish a controverted fact. The facts proven must not only be consistent with guilt, but inconsistent with innocence. Such evidence is insufficient where, assuming all to be proved which the evidence tends to prove, some other reasonable hypothesis of innocence may still be true, for it is the actual exclusion of every other reasonable hypothesis but that of guilt which invests mere circumstances with the force of proof. What circumstances will amount to proof can never be matter of general definition; the legal test is the sufficiency of the evidence to satisfy the understanding and conscience of the jury beyond a reasonable doubt.''

Still later the court said: ''You are instructed that, where it is attempted to prove the defendant's guilt in a criminal prosecution by circumstantial evidence, then I charge you

that in such a case the circumstances establishing the defendant's guilt must be clear and convincing and satisfy you to a moral certainty and beyond a reasonable doubt of the defendant's guilt, and if the chain of circumstances be incomplete, or if there be in your mind a reasonable doubt as to the existence or the truth of one of the links in the chain without which the chain is broken and incomplete, then the guilt of the defendant has not been proved beyond a reasonable doubt.''

From these many instructions, which must all be considered with the instruction complained of, can it be possible that the jury understood that they must give circumstantial evidence more or greater weight in their deliberations than they could give direct evidence, simply because the court compared the two classes of evidence in an introductory statement which he read from a book, or quoted from a book, stating at the time he was so reading or quoting? We think not. The quotation was uncalled for as an instruction. The law upon a given subject is not found in the language used, but in the principle found in the language used, conveyed to the understanding through the language used. The same principle may be found running through and lending the chief color to a great many cases, which at a glance would seem to be foreign, the one from the other, yet akin in some particular, such as dependent upon circumstantial evidence, but an instruction upon circumstantial evidence in one case might be correct when given, but if given in the same words in another case, owing to different facts, such instruction might be meaningless, harmless, or harmful. So, while in this record the extract quoted from the venerable authority upon criminal law is correct, interesting, entertaining, and instructive to a student, it is not warranted as an instruction to a jury, but under the state of this record no possible harm could seem to result to the accused. The rule of law applicable was fully covered by the court in later instructions and as favorably to accused's case as he could expect, and therefore no injury would appear to result from the uncalled for dissertation on the subject.

The appellant complains of the following paragraph of the instruction:

XVII Ariz.—19

"The court further instructs the jury that, in arriving at a verdict in this case, you are the sole judges of the facts and credibility of each and every witness introduced in this case, and you have the right to disregard the testimony of any witness or witnesses who, in the opinion of the jury, may have testified falsely in this case, or give to the testimony of any such witness such weight as, in the opinion of the jury, the same may be entitled to, and in ascertaining such weight the jury may take into consideration the character and motive of the witnesses as disclosed by the evidence in this case. And if you believe that any witness has testified falsely, you are at liberty to disregard his testimony excepting only so far as his testimony may be corroborated by the testimony of other credible evidence."

The objection made is that before the jury are justified in disregarding all the testimony of a witness who has given false testimony, the jury must be satisfied that such false testimony must have been given concerning a fact material to the issue on trial, and given by the witness willfully knowing it to be false. Such unquestionably is the rule. Later in the instruction we find the court saying to the jury:

"If the jury believe from the evidence that any witness in this cause has willfully sworn falsely on this trial as to any matter or thing material to the issues in the case, then the jury are at liberty to disregard his entire testimony, except in so far as it has been corroborated by other evidence, or by the facts and circumstances proved on the trial."

This instruction corrects the error complained of in the former paragraph, but it is not correct by failing to state that the testimony must be corroborated by other "credible" evidence.

Still later in the instruction the following appears:

"If you believe that any witness has willfully testified falsely as to any material fact in the case, you are at liberty to disregard the entire testimony of such witness, except in so far as it may be corroborated by other credible evidence appearing in the case."

These instructions, considered together as a whole, correctly lay down the rule of law by which the jury may arrive at the facts from the evidence in question.

The appellant complains that the instruction precludes a conviction of manslaughter in case the jury find the intentional killing was done upon a sudden quarrel or in the heat of passion. Under the facts of this case no verdict of manslaughter could properly stand, for the reason there appears no evidence to support such a charge. The appellant claims that another, not he, killed Peterson. There is no evidence of a sudden quarrel or heat of passion existing between appellant and the deceased resulting in the commission of the homicide by appellant. An instruction on manslaughter under the facts disclosed would have been inappropriate to any facts in the case.

The court refused the following instruction requested by the appellant:

"Though you may find that the defendant killed Carl Peterson at the time named in the information, and though you may further find that such killing constituted murder, yet I charge you, notwithstanding such finding, if you find from the evidence that such killing was done upon the sudden heat of passion during a quarrel between the defendant and Carl Peterson, and that the killing was done without the defendant having formed a willful, deliberate and premeditated intent to take the life of Carl Peterson, or if in your mind a reasonable doubt thereof exists, then I charge you that you cannot find the defendant guilty of murder in the first degree."

This instruction was properly refused. First, there is no evidence of sudden heat of passion between the accused and deceased resulting in the commission of the homicide by the accused, because accused claims he did not kill Peterson, and that part of the requested instruction is without the support of evidence; next, the instruction is calculated to mislead the jury into the belief that a deliberate and premeditated design to kill cannot be formed when heat of passion arises upon a sudden quarrel, and that in order to form a deliberate intention to kill, time in which to form that design must be shown, but the law is otherwise. No appreciable length of time is required to exist for deliberation and premeditation; the fact that the killing results from deliberation and premeditation is all that the law requires to justify a finding of murder of the first degree.

Instructions were requested and refused dealing with the degrees of murder and manslaughter. An examination discloses that the court fully and fairly gave all such instructions as the facts of the case warrant. No good purpose will result from a discussion of the assignments in detail.

The accused requested an instruction that the testimony of witnesses Pomero and his wife, if they were found to be accomplices, should be corroborated before a conviction could be had. The evidence nowhere intimates that these witnesses were accomplices of the accused. The accused testified alone that Pomero killed Peterson, and Pomero's wife was present encouraging the killing. From this the inference to be drawn would be that Pomero was intending to kill accused, and thought he was killing accused while he was killing Peterson. That instruction had no relation to the facts of the case in any possible light. The witnesses, from accused's testimony, were not his accomplices; they were his adversaries; and his testimony is the only evidence in the record that remotely connects Pomero and his wife with the killing.

The ninth and tenth assignments are untenable for the same reasons last given.

The accused requested an instruction dealing with statements of an incriminating nature made by one accused of crime to an officer, and instructing that such statements must have been voluntarily made without any influence of hope or fear. Such instruction was properly refused. An examination of the record discloses no issue of the voluntary nature of the statements made by the accused. He denies that he made any such statements as testified to by the officer, and gives his version of what he did state.

Error is based upon the refusal of the court to instruct as follows:

"I charge you that confessions or admissions of guilt are to be received by the jury with great caution, and unless supported by other evidence in the case are not sufficient to convict."

This instruction requests an expression of opinion by the court upon the weight to be given confessions or admissions.

"The general rule is that the weight and credibility of confessions are to be determined by the jury under all the cir-

cumstances of the case, and that the court would not express any opinion as to their weight." 12 Cyc. 600.

The requested instruction ignores this general rule, and was properly refused.

Many other errors are alleged, and we have carefully examined them, but find no errors that affect the substantial rights of the accused.

The record is voluminous, but upon the whole case it appears that substantial justice has been done. Section 1170, Penal Code of Arizona 1913. The decisive issue of fact was whether defendant, Faltin, or witness Pomero struck the fatal blow. The jury determined that question against the contention of Faltin upon substantial, convincing evidence. The many objections raised and referred to above generally have but slight bearing upon the determination of the main issue, and for that reason a discussion would extend this opinion to undue length without profit to the accused, the bar or the court.

No reversible error appearing in the record, the judgment of conviction is affirmed, and judgment is hereby entered fixing the time when the original sentence of death shall be executed as required by section 1177 of the Penal Code of Arizona of 1913.

Affirmed.

ROSS, C. J., and FRANKLIN, J., concur.

