[Criminal No. 857. Filed November 1, 1937.]

[73 Pac. (2d) 96.]

FRANK RILEY, Appellant, v. STATE OF ARIZONA, Respondent.

Messrs. Favour & Baker and Mr. A. M. Crawford, for Appellant.

Mr. Joe Conway, Attorney General, Mr. W. E. Polley, his Assistant and Mr. Carl D. Hammond, County Attorney, for Respondent.

LOCKWOOD, J.—Frank Riley, hereinafter called defendant, was convicted of the crime of assault with a deadly weapon upon one Page Theirs, in the superior court of Mohave county, and was sentenced to serve not more than ten nor less then eight years in the Arizona State Prison.

There is a sharp conflict in the evidence admitted at the trial, and counsel for the State and for the defendant each naturally takes that view of the evidence which supports his theory of the case. Since the jury returned a verdict of guilty against the defendant, under our oft-repeated rule we are compelled to adopt the State's theory in so far as it may be supported by any reasonable evidence in the case. Thus taken, the ultimate facts are shown to be as follows.

Mr. and Mrs. Ancel Taylor are reputable and well-known citizens of Peach Springs, in Mohave county, Arizona, and operate an auto camp, service station, trading post, and restaurant at that place. Defendant, a man of about 43 years, came to Arizona some 2 years ago, and eventually secured employment as a general handy man around the various enterprises of the Taylors, where he was working at the time of the commission of the crime of which he has been convicted. Page Theirs, who was the victim of the assault, was an employee of the highway department, whose home was in Phoenix but who was temporarily stationed in Mohave county, with Peach Springs as his headquarters. About January 3, 1936, Theirs, together with a number of other employees of the highway department, attended a birthday party given to the daughter of the Taylors, in their restaurant, Tay-

lor also being present. Mrs. Taylor and Riley were both out of town, returning about the time the party broke up. Apparently all the guests at the party indulged in the usual merrymaking of the holidays, and there is evidence that the ornaments on a Christmas tree which was standing in the café had been broken up during the festivities. It does not appear, however, that any quarrel or difficulty arose between the guests. About noon of January 19th, Theirs, together with his wife and children, had taken a trip to Hyde Park, a little place not far from Peach Springs, returning about 5:30, and about 7:30 that night he took his 5 year old daughter to the Taylor café for dinner. They were accompanied by three other employees of the highway department, named Kellner, Vallandingham, and Dudley, and found one Frank Modina, an employee of the Indian department, seated at the counter eating. Theirs and his party sat down at a table and ordered dinner, this being served some time between 7:30 and 8. The customary closing time of the restaurant was 8 o'clock, and, since there was a show being held in the schoolhouse that night, the Chinese help in the restaurant were very anxious that the customers finish their meals promptly so that they might attend the show. It appeared that Theirs and his party would not be through until some time after 8, so one of the Chinese help left the restaurant, and in three or four minutes the defendant came in the front door, walked behind the counter, and stood there looking at the party. Kenneth Kellner had heard that Riley had a bad reputation for being troublesome and starting fights, and believing that he had come in for the purpose of hastening the party in finishing their meal and leaving the restaurant, made the remark to him, ''Frank, we are going to finish our meal and if you are going to throw anyone out, it isn't going to be us.'' Riley immediately started around· the counter

towards Kellner, and, when he had reached the latter's chair they got into a scuffle, Kellner attempting to push Riley out of the door, which he finally succeeded in doing. No blows, however, were actually struck by either party. A few minutes later, Riley again entered the café and was ejected, this time by Kellner and Theirs together. About five minutes later, Riley appeared again behind the counter of the restaurant with a gun in his hand. Kellner and Dudley, other members of the highway party looked up and saw Riley standing there, and Dudley said, "Look out, he has a gun." Defendant profanely ordered the party out of the restaurant, aiming the gun first at Kellner, and then switched it until it was pointing at Theirs, and fired a shot. At the time of Dudley's remark, Theirs was sitting with his back towards Riley. He partially turned around, threw his left hand in front of his face, and started to rise, being about half way out of his chair when the shot was fired. The bullet went through his left hand, the left side of the lower lip and teeth, into the throat, and lodged in his vertebra. He was so badly wounded that he was still in the hospital at the time of the trial, which was held on the 26th of February, and was unable to be present and testify. Riley immediately left the café, and went over to the Taylor home. He was later arrested and tried and convicted, as we have stated.

There are 18 assignments of error which are grouped, as required by the rules, under certain propositions of law. We think, however, on a careful examination that it will be necessary to consider these assignments separately. The propositions of law are generally correct as abstract statements, but are so worded that we cannot determine whether the rule laid down therein was violated, without examining the assignments separately and comparing them with the reporter's transcript of the evidence.

■ The first assignment goes to the action of the trial court in denying the challenge of the defendant to a prospective juror, made on the ground that his answer showed he was not impartial. The question of whether a juror should be excluded on a challenge for cause, on the ground that he will not be fair and impartial is, to a great extent, in the sound legal discretion of the trial court. *Burnett* v. *State,* 34 Ariz. 129, 268 Pac. 611. After reading the examination of this juror on his *voir dire,* we are of the opinion that the court did not abuse its discretion in refusing to sustain the challenge.

■ The second assignment is that the court refused to exclude one of the State's witnesses, Kenneth Kellner, when all of the other witnesses were excluded from the courtroom. It is generally advisable in a criminal case that the county attorney have the prosecuting witness at hand so that he may, from time to time, question him in regard to the facts of the case in order that it may be properly presented to the jury, and such is the almost universal practice in this State. It appears from the record that the injured man, who would ordinarily have been the prosecuting witness, was unable to be present at the trial. The original complaint was signed by Kellner, and he was an eyewitness of the proceedings in the restaurant. The exclusion of witnesses from the courtroom is within the sound discretion of the trial judge, and we think the custom above referred to is a proper one under ordinary circumstances, and, unless it appears that the rights of the defendant were prejudiced thereby, it is not error to permit the prosecuting witness to be present. The assignment is without merit. *Bellamack* v. *State,* 37 Ariz. 344, 294 Pac. 622.

■ The third assignment is that the court refused to permit the witness Modina to demonstrate before the jury the position in which Theirs was sitting

at the time he was shot. Physical demonstrations of this kind are also within the sound discretion of the trial court. *Moon* v. *State,* 22 Ariz. 418, 198 Pac. 288, 16 A. L. R. 362. Practically all of those present at the time of the shooting, with the exception of Theirs and his little daughter, testified fully in regard to the position Theirs was in at the time he was shot. While we think it would have been better for the trial court to permit the witness Modina to illustrate and explain his testimony to the jury, as requested by counsel for the defendant, in view of all of the testimony, we cannot think that, even if the exclusion of the demonstration was erroneous, it was prejudicial.

 The fourth assignment is that the witness Kellner was allowed to give hearsay testimony. It appears that upon cross-examination of Kellner, the following questions and answers occurred:

"Q. Well, what made you think, Mr. Kellner, that Mr. Riley was going to throw anybody out of the room? What suggested that to your mind? A. That would have to take in a lot of things and maybe I am not allowed to explain it.

"The Court: Explain it. A. Well, I had heard a lot of things since I had been up there; that Riley was pugilistic and had whipped several Indians and had had several fights. He was doing nothing; just standing there and looking at me. At first I said nothing. He was staring at me and I was looking back and it came to my mind that he was mad about something or other. That is my explanation.

"Mr. Favour (continuing): Q. That is your explanation? A. Yes, sir."

All this went in without objection or motion to strike. Later on, on redirect examination, Kellner was asked by the county attorney:

"Q. And why did you say that to him?

"Mr. Favour: I object to that if your Honor please; that has been covered completely and on cross examination it was explained.

"The Court: Objection overruled.

"Mr. Bollinger (continuing): Q. You may state why you said that to him? A. Well, I had heard that Mr. Riley had chased a Chinaman with an ax and a butcher knife and run one of them out of town; that he had had several fights and his reputation as a whole was a bully and I felt he came in, because of his attitude while standing there, that he came in to put us out of there and I knew the Chinaman did want to go to the show"

—which was objected to on the ground that it had been fully testified to in cross-examination. The objection was overruled.

It is, of course, obvious that the answer made by the witness on cross-examination was purely a matter of hearsay, and therefore not properly admissible. Further, it was an attack upon the character of defendant as being a turbulent and violent man, when his character was not a proper issue in the case. Had the evidence offered in rebuttal been offered in the examination in chief and admitted, it would, of course, have been error of a grievous kind. It appears, however, that the matter was first brought out by counsel for the defendant in cross-examination. Kellner was asked by counsel for defendant as to his reason for believing that Riley was going to throw anyone out of the restaurant. It seems to us that counsel should have realized that such a question opened wide the door for evidence of the very character to which he now objects, and that, when the witness gave the answer, "That would have to take in a lot of things and maybe I am not allowed to explain it," the danger signal was plain. Notwithstanding this, after the answer of the witness was given, there was no request that it be stricken as being hearsay or an improper attack upon the character of the defendant, but counsel merely said, "That is your explanation?" and passed on to other matters. It is the rule of law that,

if counsel for a defendant on cross-examination deliberately injects improper evidence into the case, he may not be heard to complain because in rebuttal counsel for the state enters at the door which has been opened wide by the defendant. *Turley* v. *State,* 48 Ariz. 61, 59 Pac. (2d) 312. We think for the reason above stated, the fourth assignment of error is not well taken.

Assignment No. 5 is predicated on the refusal of the court to instruct the jury to disregard the reference of the county attorney to the evidence covered by assignment No. 4. Since as we have said, there was no error in the admission of the evidence, certainly it was not error for the county attorney to use it in his argument.

The sixth assignment is that the court refused to allow Mrs. Taylor to testify as to what defendant Riley had said to her immediately after the shooting. It is the position of defendant that his statement was a part of the *res gestae,* while the State contends that it was merely a self-serving declaration on his part. If it was the first, the evidence was admissible. If it was the second, it was not. The offer of evidence made by the defendant was in the following language:

"Mr. Favour: If your Honor please we avow we will show by this witness that within a few minutes before the time Page Theirs made the statement in the cabin, within about four or five minutes of the time of the actual shooting that Mr. Riley went over immediately from the scene of the shooting and that the first words that were said were these: 'Mrs. Taylor, I have shot Page Theirs' and that she said to him, 'Why did you do it?' And he said, 'I had to do it, they ganged me.'"

In the very recent case of *Keefe* v. *State, ante,* p. 293, 72 Pac. (2d) 425, 427, we discussed the meaning of the phrase *"res gestae,"* and said:

"A spontaneous exclamation may be defined as a statement or exclamation made immediately after some exciting occasion by a participant or spectator and asserting the circumstances of that occasion as it is observed by him. The admissibility of such exclamation is based on our experience that, under certain external circumstances of physical or mental shock, a stress of nervous excitement may be produced in a spectator which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him. Wigmore on Ev., (2d Ed.) Par. 1747."

The statement made by the defendant to Mrs. Taylor was clearly self-serving, in that he attempted to give a legal excuse for his conduct in shooting Theirs. The mere fact that the effect of a statement is to aid the cause of the one who makes it is not always and necessarily sufficient to take it out of the rule of *res gestae.* On the other hand, it is certainly an item to be considered in determining whether or not the statement was spontaneous or calculated. Taking all the circumstances of the present case into consideration, we think that we cannot say affirmatively the trial judge erred in classifying it as a self-serving declaration, rather than part of the *res gestae.*

The seventh assignment is that the court admitted in evidence a certain statement made by Theirs after the shooting "Why did he shoot me?" The witness said it was made in the space of a minute or a minute and a half after the shooting which, under the circumstances of violent shock to Theirs caused by the shot, would certainly justify an unprejudiced

judge in thinking that it was a spontaneous exclamation, rather than a self-serving declaration. Further the court later struck this evidence, instructing the jury to disregard it.

■ The eighth assignment is that the court erred in refusing to allow Mrs. Taylor to answer the question, "Did you talk to anybody in the highway service?" Standing alone, it would be impossible for anyone to determine whether the question was proper or not, but on examining the transcript of the evidence, it appears that it referred to some statement made by a member of the highway service in regard to a party at the café on the 3d of January. Any statement of this nature would apparently be hearsay. If it were not, the proper course for defendant, on the objection being sustained, would have been to make a proffer of evidence so that the court might determine whether it would be admissible or not, and, indeed, the record indicates that the court expected that to be done, but no such offer was made. Under the circumstances, we cannot say it was error to refuse to permit the witness to answer the question.

■ The ninth assignment is that the court refused to permit Mrs. Taylor to testify what had taken place on January 3d when Theirs and his companions had been present at the same restaurant. It appears from the examination of the witness on her *voir dire* that she was not present at the time when the defendant claimed Theirs and his companions had created a disturbance in the café, and any knowledge she might have thereof would be based upon hearsay. Defendant, was, however, permitted to call other witnesses who had been in the café, to testify as to what they actually saw that night, which, of course, was the only proper method of proving what had really occurred. We think the objection was properly sustained.

The tenth assignment is that the court allowed the witness Modina, after testifying to certain facts on direct and cross examination and after defendant had offered evidence tending to contradict Modina, to repeat in rebuttal his testimony given on direct and cross examination. While such a proceeding is not usual, it is a matter within the discretion of the trial court as to whether evidence of this kind is admissible. *People* v. *Clark,* 84 Cal. 573, 24 Pac. 313. Even, however, though it were error, we think it is not of so prejudicial a nature that it requires a reversal of the case. *People* v. *Emerson,* 130 Cal. 562, 62 Pac. 1069.

The eleventh, twelfth, and thirteenth assignments are, in substance, the same as the tenth, except that they apply to different witnesses. The rule is, therefore, necessarily the same, that even though it might be technical error it was not so prejudicial as to require a reversal of the case.

The fourteenth assignment is that the court gave the following instruction:

"In every crime or public offense there must exist a union or joint operation of act and intent, or criminal negligence. The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity,"

and that since, obviously, there was no criminal negligence in the case, it was error to mention it. This is a stock instruction, quoting the exact language of the statute (Rev. Code 1928, § 4486), and is given as a matter of course in practically every criminal case tried in the State of Arizona. We certainly cannot see where the defendant could have been in anywise prejudiced thereby.

 The fifteenth assignment is that instruction No. 8 given by the court in effect told the jury that, if they made a mistake in their conclusion as to the facts on a conflict of the evidence, they need feel no responsibility therefor, since the Supreme Court would correct it. This instruction reads as follows:

"You are instructed that the Constitution of Arizona provides that judges shall not charge juries with respect to matters of facts, nor comment thereon. The law makes you the sole judges of the facts of the case, and if any remarks have been inadvertently made that might be construed by you as an indication of any opinion which the Court may have as to the evidence, you should disregard all such remarks. You are further instructed that counsel for the State and for the defendant have the legal right to present arguments to you, both as to the law and as to the facts pertinent and relevant to the case and tending to sustain their respective contentions; but you are bound to receive as law that which is given to you as such by the Court. Your oaths as jurors require that you do so. If the trial court errs in any respect, the Supreme Court may correct any such error, and it is no concern or responsibility of the jurors."

If it had the meaning attributed to it by the counsel for the defendant, it would indeed be grievous error, for this court has said repeatedly that it will not disturb the verdict of a jury on the ground of a conflict in the evidence. We think, however, that no reasonable man would give that construction to the instruction in question. Its obvious meaning is that the jury were the sole judges of the facts, but that they were bound to receive as law what was given them by the trial court, and, if the trial court erred in its statement of the law, the Supreme Court would correct the error. This was a correct statement of the law and of the scope of a review in this court. We think no reasonable juror could have imagined from the instruction that the Supreme Court would attempt to

correct an error of the jury on the facts, but only that it would correct an error of the trial court on the law.

The sixteenth assignment covers an instruction on the right of self-defense. Since it is somewhat lengthy, we see no use in setting it forth in full. The instruction must, of course, be considered as a whole and not separately. *Faltin* v. *State,* 17 Ariz. 278, 151 Pac. 952. We think the instruction, taken together with the others given by the court, correctly states the law.

The seventeenth assignment is that the court erred in refusing to give the following instruction:

"You are further instructed that if you find from the evidence that at the time the defendant shot Theirs, Theirs was attempting to assault the defendant, or if it reasonably appeared so to the defendant, viewed from the defendant's standpoint alone and in the light of words and acts of Theirs, that Theirs was about to make an unlawful attack upon the defendant, then you are instructed that in that event the defendant had the right to defend himself from bodily harm, and this is true although it may appear afterwards that the defendant used more force in defending himself than was actually necessary."

The substance of this instruction was fully covered in instruction No. 15 given on its own volition by the trial court, to the effect that the jurors must view the case from the standpoint of the facts as they reasonably appeared to the defendant at the time, and that it made no difference whether the danger was real or apparent, if it reasonably appeared real to the defendant. It was not error to refuse to give the instruction asked by the defendant.

The eighteenth assignment is that the court failed to give the following instruction:

"You are further instructed that if you find from the evidence that the defendant shot Theirs, believing at the time of doing so that Theirs was making or

about to make an attack upon the defendant, and if you find from the evidence that Theirs had made previous attacks upon the defendant, then you should consider the manner and character of the previous attacks and their effect upon the defendant's belief and reasonable expectancy of fear of great bodily injury at the hands of Theirs, and if you find that the defendant was acting under reasonable expectancy of fear of great bodily injury at the time he shot Theirs, then the shooting was justifiable and you must find the defendant not guilty.''

We think that the requested instruction comes perilously near to a comment on the evidence, and that, in so far as it was a correct exposition of the law, it was covered by the general instruction given by the trial court on the right of self-defense. This covers all of the assignments of error.

 As we have said, one or two of the assignments do show technical error in the course of the trial, but, considering the case as a whole, we are satisfied that, had the errors not been committed, there is no reasonable probability that the verdict of the jury would have been any different. According to the testimony of the witnesses for the State, the defendant, after a previous altercation the same night with Theirs and his party in the restaurant, armed himself, returned to the restaurant, and without any further provocation opened fire, seriously wounding Theirs. According to the testimony of defendant, Theirs assaulted defendant under circumstances such as to indicate to defendant he was about to do him great bodily injury, and that, acting solely in an endeavor to protect himself, he fired the shot. The jury, after hearing all of the testimony upon this point, concluded that the State's theory of what happened was the correct one. It is not reasonable to suppose that any of the errors committed by the trial court could or would have changed the opinion of the jury upon this vital point,

and if this be so, the errors were of the kind referred to in article 6, section 22, of the Constitution, and under such section it is our duty to affirm the conviction.

McALISTER, C. J., and ROSS, J., concur.