STATE of Missouri, Respondent,

v.

Thomas L. PFLUGRADT, Appellant.

No. 25480.

Kansas City Court of Appeals, Missouri.

Feb. 1, 1971.

Downs & Pierce, John E. Downs, St. Joseph, for appellant.

Hugh A. Sprague, Pros. Atty., Donald E. Parker, Asst. Pros. Atty., St. Joseph, for respondent.

SHANGLER, Presiding Judge.

Defendant Thomas L. Pflugradt was charged under Sec. 559.180, V.A.M.S., with assault with his hands and fists with malice aforethought upon David Ross Stout, the complaining witness, with the intent to do him great bodily harm. The jury found defendant guilty of common assault and assessed his punishment at a fine of $100.-00 and three months' imprisonment. The court entered judgment accordingly and committed defendant to the Buchanan County Jail.

On this appeal, defendant challenges the sufficiency of the evidence to sustain the conviction. He also charges the trial court erroneously excluded certain statements as hearsay, although they were properly admissible as part of the res gestae.

The State's case tended to show these facts: David Ross Stout had concluded his day's work at 11:00 A.M. on November 27, 1968. He first went home and then, with his family, went to the home of his brother-in-law located on the north side of Olive Street in St. Joseph, Missouri. Between this home and 18th Street to the east were located a Plate Glass Company and then a laundromat, which occupied the northwest corner of 18th and Olive. Harold's Tavern occupied the northeast corner of that intersection, and the L & M Tavern its southwest corner. The main entrance to the L & M Tavern was angled across its northeast corner and was separated by a plate glass window from its other entrance to the west which opened onto Olive Street.

Stout testified that about noon, he crossed the street to the L & M Tavern, cashed his paycheck, had a beer, and returned to his brother-in-law's. He returned to the tavern about 5:30 P.M. and remained until 8:00 P.M., drinking five per cent beer and shooting pool all the while, when he took a bartender home. He returned once again, resumed the same activities, so by the time he left through the main entrance at 1:15 A.M., he was in that middling state somewhere between near sobriety and near drunkenness. He walked west and then across Olive and as he reached the sidewalk, just a few feet west of the laundromat, he was accosted by a man in a red jacket (later identified as Gerald Nigh), flourishing a pistol with his left hand. Two other men came up from behind on either side of Stout; each grabbed one of his arms. (Defendant Pflugradt was later identified as the man restraining his left arm, and Paul Dryer, his right arm.) With his right hand, Nigh struck Stout "below the belt" and Stout buckled. As he was falling to the ground, the other two, still holding his arms, struck Stout with their fists "all around (his) back and sides". Stout moved his body in an attempt to avoid the blows, and in so doing, saw defendant strike him. The area was illuminated by a street light across the street on Olive as well as by the interior lights of the laundromat coming through its plate glass window. Stout fell to the ground along the sidewalk and gutter between two cars, and as he lay there, was kicked and cursed by all three assailants. Nigh was urging: "Kick him, kill him, kick him", while defendant called him a "son-of-a-bitch". Then, at Nigh's direction, he was dragged into the laundromat and left on the floor and was not molested thereafter. He heard Nigh say: "You guys just quit, and I'll call this in and take care of it. Let me do the talking". Stout was familiar with the interior of the laundromat, having done his laundry there, and heard Nigh place money in the telephone but heard no conversation. Stout then heard "a lot of commotion coming in the

building", and went to the sink at the rear of the building to wash the blood from his head. He was bleeding also from the ear, eye, about the face and inside the mouth. After an unspecified lapse of time, the police arrived. Stout reported to them that Nigh had a gun. They removed it from his person and arrested him, together with Pflugradt and Dryer. Stout was removed to a hospital by ambulance where his lacerated left ear was repaired and a torn tear duct and other injuries treated.

Through the window of the L & M Tavern, John Cunningham and Clarence Jones witnessed a fracas and testified as to what they saw. Cunningham had arrived at the tavern about 12:15 A.M. He had come to see his father who tended bar there. He had not known Stout before he was introduced to him that morning. A few minutes before the 1:30 A.M. closing time, he saw Stout leave. Cunningham then looked through the tavern front window in the direction of the laundromat and saw four men, two wearing white shirts beating another one between them with their fists, and a fourth man, wearing a red jacket then participating with the other two. Although it was "pretty light" in the area of the laundromat, because of the distance, Cunningham could not identify the assailants or the man beaten, but "had an idea who it was". Cunningham then went into the street and saw all three men kicking at the other, by now prostrate along the curb and gutter, but was not certain whether the blows were actually struck. He heard no words spoken by anyone. He then thought the man in the red jacket was about to get into his car, so he shouted its license number to Clarence Jones who was nearby. Instead, the red-jacketed man and the other two dragged the beaten man into the laundromat. Cunningham then saw the red-jacketed man pick up the telephone receiver. The police then arrived and took all three assailants into custody.

Clarence Jones also looked through the window in the direction of the laundromat and saw a man lying "off the curb" and two others, wearing "light jackets", apparently kicking him. Because of the distance, he could not tell if the blows actually struck. A fourth man, in a red jacket, was standing by, but struck no blows. It was Jones who then telephoned the police. He went outside, but by then, the man under assault had been taken inside the laundromat. As the three assailants got into a car, Jones started to take down the license number, but did not complete doing so because the three returned to the laundromat. The police arrived a minute and a half or two minutes after Jones had telephoned. Jones then went to the laundromat, stood in its doorway and saw all four men inside, including the one who had seemingly been beaten. He was wiping blood from his face which was bleeding badly. At no time did Jones see the red-jacketed man with a gun, nor hear any conversation spoken, nor see any of the three make any attempt to stop the others from striking the fourth.

Officers Willard Hunt and Dale Watkins, both of the St. Joseph Police Department, were summoned separately to the scene of the disturbance. Hunt arrived about one minute after having received the call. He found Stout, Nigh, Dryer and defendant Pflugradt in the laundromat. Stout, standing at the rear wall, had been severely beaten and was bleeding from the mouth, along the nose and from his ear. The other three were standing by the telephone. Upon inspection, he found blood smeared across the back of Pflugradt's knuckles, but none on the palms of his hands. The toes of his shoes were also splattered with blood. Pflugradt was neatly dressed, however, and offered no resistance. Hunt searched Nigh, removed a holstered revolver from his person, and arrested him.

Officer Watkins arrived as Officer Hunt was entering the laundromat. He, too, found Stout and the others inside, and, he, too, found that Stout had been beaten and was bleeding from his ear, mouth and eyelid. His examination of Pflugradt's

person also disclosed that defendant's knuckles and shoes were smeared with blood.

The defendant's evidence was to the effect that at about one o'clock that morning, after having been in Harold's Club (cater-corner from the L & M Tavern across that jogged intersection) intermittently since one o'clock the previous afternoon, he stepped out for a breath of air with Dryer with whom he had been playing pool. He and Dryer became embroiled with a Mike Kelly whom he then struck, but someone from the L & M Tavern broke it up. They returned to Harold's Club. Gerald Nigh was also there. The defendant had seen him, spoke to him, and knew him to be a deputy sheriff. About closing time, defendant and Dryer left. They thought they saw Kelly again and gave chase unsuccessfully. As they were returning to Harold's Club for more beer, Nigh shouted to them from in front of the laundromat. There they saw a man, not known to them, lying on the ground. Nigh asked them to carry the man into the laundromat while he telephoned the sheriff's office. They complied. About then, the police arrived. Defendant denied ever striking or kicking the man he had helped move into the laundromat.

Gerald Nigh, who had been employed as a deputy to the Sheriff of Buchanan County for about a year, had come into Harold's Club about 12:30 A.M., dressed in a red jacket and armed with his service revolver. While there, he spoke to defendant and Dryer whom he knew. About 1:30 A.M., as he left Harold's Club (defendant and Dryer having preceded him in leaving), he thought there was some commotion across the street by the L & M Tavern, "thought it was Mr. Pflugradt and Mr. Dryer and I yelled at them". They did not respond but ran past the L & M Tavern, another man, also running, preceding them. Nigh went to his car parked in front of the laundromat, heard a noise, and saw a body lying on the sidewalk. He turned and saw defendant and Dryer standing on the corner where the laundromat was situated and asked them to help take the man inside. They did, by dragging him. Nigh then telephoned the sheriff's office. As he hung up, the police arrived. Nigh testified the man's face was bloody, but did not know how he was injured. He saw neither the defendant strike him, nor did he, and although he had a gun in his possession, he did not "hold (it) on him".

◼ Appellant argues that in assessing the sufficiency of the evidence to support the conviction against him, the standard applicable to cases where the evidence is wholly circumstantial must be applied because there is no "direct, credible and substantial" evidence that he struck the complaining witness, Stout. By this we do not understand him to mean that there was not evidence, at least from Stout himself and based on his knowledge, that appellant struck him with his fists, but rather that such evidence has no probative value. Appellant argues that Stout's admittedly partial inebriation and incapacity for clear judgment on the occasion to which he testified coupled with contradictions between the testimony given at the trial and other hearings nullify the substance of his testimony.

◼ We note first of all that defendant made no objection to the competency of either Stout or his testimony because of his inebriation or impaired judgment. In any event, a witness is not incompetent because he was intoxicated at the time of the event testified to, unless he was so intoxicated as to have been insensible. Wharton's Criminal Evidence, Vol. 3, 12th Ed., p. 87; 97 C.J.S. Witnesses § 59. Such a condition of the witness effects only the weight and credence to be given his testimony by the trier of fact, and not its competency. Anderson v. State, 30 Ala.App. 124, 2 So.2d 461, 148 A.L.R. 1153.

◼ The source of the contradictions which appellant finds in Stout's testimony,

and which he inferentially contends nullifies the probative effect of his trial testimony, was testimony given by Stout at the preliminary hearings of defendant and Nigh, separately charged and tried. For instance, at the trial Stout identified defendant as the man holding him by the left arm. He was confronted with this preliminary hearing colloquy: "Q. Do you know which man grabbed you on the right and which grabbed you on the left? A. (Stout) No, sir." Appellant cites what he considers other instances of testimonial inconsistencies. The point is, however, that prior inconsistent statements of a witness, even though he is in the position of a party, have no probative value. Such statements may be considered only as impeaching the credibility of the witness, for if he was mistaken about the subject in issue once, he could be mistaken again. They have no substantive, probative value and do not destroy the prima facie probative effect of contrary testimony given by the witness at the subsequent trial. State v. Gordon, Mo., 391 S.W.2d 346, 349; Higgins v. Terminal R. R. Ass'n. of St. L., 362 Mo. 264, 241 S.W.2d 380, 384 [6]. In this case, the jury resolved the question of credibility in favor of the State.

Appellant then argues that Stout "admits that he does not know of his own direct knowledge whether or not he was in fact struck by Appellant", and in support cites this transcript excerpt of his cross-examination:

"Q. Can you tell how many times you were struck in the body by either of the two men—I am talking about Tommy [Appellant] and Dryer on that night?

"A. No, I can't say exactly, no sir.
* * *

"Q. And you don't know whether Tommy hit you the two or Dryer hit you four and one, do you?

"A. For all I know, he could have done it all.

"Q. And for all you know, the other could have done it all, right?

"A. Right."

This argument is disingenuous and misleading. The subject of that inquiry, within context, was how many times Stout had been struck by the *feet* of defendant (and the other two assailants), not by his *hands and fists* as he was charged and for which he was convicted under instructions of the court requiring that finding. Actually, under defendant's insistent questioning, Stout repeatedly testified that Pflugradt had struck him with his hands, so that the jury's verdict requiring that finding was reasonably based on the evidence.

At that, it was not necessary to prove that defendant Pflugradt, himself, administered the hand blows; proof of his affirmative and guilty participation in the manual assault on Stout, even though Dryer or Nigh alone actually struck the blows, was sufficient to sustain the conviction. As the jury was instructed, all persons who act together with a common intent and purpose in the commission of a crime are equally guilty, if they shared consciously in the criminal act as something they intended to bring about. State v. Slade, Mo., 338 S.W.2d 802, 806 [5, 6]; State v. Irby, Mo., 423 S.W.2d 800, 803 [3, 5].

We have concluded that the direct evidence of Stout, corroborated by the direct and circumstantial evidence of Jones and Cunningham, whom the jury could have reasonably found were describing the manual assault testified to by Stout, the blood smears found by Officers Hunt and Watkins across defendant's knuckles and shoes and the admitted presence of all three assailants at the locality of the event, was sufficient to sustain the jury's verdict. The guilty participation of defendant in the common purpose of perpetrating the manual assault was proved by substantial evidence. In considering the sufficiency of the evidence to support the guilty verdict,

we have taken as true all the evidence tending to show defendant's guilt, whether it be direct or circumstantial, together with all inferences reasonably to be drawn from it. State v. Webb, Mo., 423 S.W.2d 795, 799 [6]; State v. Whitaker, Mo., 275 S.W.2d 316, 319 [10, 11]. And by "substantial evidence" we mean evidence from which the triers of fact reasonably could find the issues in harmony therewith. State v. Taylor, Mo., 445 S.W.2d 282, 284 [4].

Appellant next contends the trial court erred in refusing to receive in evidence, as part of the res gestae, testimony of statements made by appellant and Nigh to Officer Hunt immediately upon his arrival at the scene explaining the appellant had not assaulted Stout, but that he and Dryer had come to Stout's aid at Nigh's direction. The court refused these declarations as self-serving hearsay after offer of proof was made wherein Officer Hunt acknowledged they had been made in his presence immediately upon his arrival at the laundromat.

■ Although the hearsay rule forbids the use of extrajudicial statements as testimony to the truth of the facts asserted, they are admissible under an exception to the hearsay rule when they form part of the res gestae. "(R)es gestae refers to those exclamations and statements made by either the participants, victims, or spectators to a crime immediately before, during, or immediately after the commission of the crime, when the circumstances are such that the statements made were a spontaneous reaction or utterance inspired by the excitement of the occasion and there was no opportunity for the declarant to deliberate and to fabricate a false statement." Wharton, Criminal Evidence, 12th Ed., Vol. 1, Sec. 279.; State v. Fletcher, Mo., 190 S.W. 317, 320 [6]; Annotation, 78 A.L.R.2d 300. Spontaneous utterances which qualify under the res gestae rule are admissible whether they are those of the defendant, the victim, or third persons and may be testified to in court by the declar-

ant or by persons who heard them. State v. Rodgers, Mo., 102 S.W.2d 566, 568 [2]; State v. Sarkis, Mo., 313 S.W.2d 723, 726 [5]. And statements of an accused at the time of his arrest are admissible as part of the res gestae when the arrest was made closely enough to the commission of the offense that the statements were made while the mind was still acting under the exciting cause of the occurrence. State v. Sampson, Mo., 408 S.W.2d 84, 88 [7–9].

■ The essential test for the admissibility of such statements, therefore, is spontaneity, and here proof of that essential element is lacking. Appellant argues that because Officer Hunt arrived at the scene "almost immediately after the incident" the statements were "clearly * * *. spontaneously made". "(T)he fact that an utterance is made a very short time after the event will, in and of itself, have little weight in producing an affirmative conclusion that it is admissible." Wren v. St. Louis Public Service Co., Mo., 333 S.W.2d 92, 95 [2]. The evidence fairly shows that between one and one-half and two minutes elapsed between Jones' telephone call to the police and the arrival of Hunt. By the time Jones had completed his telephone conversation, Stout had already been dragged into the laundromat and the physical assault upon him had ended. When Hunt arrived, he found Pflugradt, Dryer and Nigh grouped around the telephone. Nigh had just finished talking to the sheriff's office. Obviously, Nigh had had sufficient time to re-order his thoughts concerning the event, otherwise he could not have reported it coherently. There is no reason to suppose that Pflugradt's reflective faculties had not been equally restored by then. On the basis of Stout's evidence that before making that call Nigh had told the other two: "You guys just quit, and I'll call this in and take care of it. Let me do the talking", the court could reasonably have found that the substance of his call, and the ensuing declarations reflecting that substance, were a jointly concocted exculpatory explanation

of the event. The exculpatory quality of the declarations tends to the inference that excitation and spontaneity had given way to calculated considerations of self-interest. Riley v. State, 50 Ariz. 442, 73 P.2d 96, 101 [12].

Appellant offered the declarations as part of the res gestae, so the burden was his to show they were in fact spontaneous. Woods v. Southern Ry. Co., Mo., 73 S.W. 2d 374, 377 [2–4]. This he failed to do. The trial court apparently believed that the statements of Pflugradt and Nigh sprang not from the event but from calculation. We have no reason to conclude otherwise.

The judgment is affirmed.

All concur.