[Criminal No. 842. Filed March 1, 1937.]

[65 Pac. (2d) 646.]

GEORGE ANTONE, *Alias* GEORGE JOHNSON, Appellant, v. STATE OF ARIZONA, Respondent.

Mr. Fred L. Ingraham, Mr. Wm. F. Timmons and Mr. Mercer Hemperley, for Appellant.

Mr. John L. Sullivan, former Attorney General, Mr. W. Francis Wilson, Assistant Attorney General, briefed case; Mr. Joseph W. Conway, present Attorney General, Mr. Albert M. Garcia, Assistant Attorney General, Mr. Glenn Copple, County Attorney, and Mr. A. J. Eddy, Deputy County Attorney, argued case, for the State.

ROSS, J.—The defendant was informed against for murder in the second degree and, being convicted thereof, has appealed. The grounds of appeal are of such nature as to make it necessary that we state in a

general way what the evidence in behalf of the State shows.

■ The defendant and the man he is accused of killing are both Cocopah Indians and lived on an Indian reservation west of Somerton in the Yuma Valley, Yuma county, Arizona. The evidence is not different from what it usually is when given by Indians. It is, we think, common knowledge that these people are very loath to bear witness against each other. They were evasive and from the record, we would judge, unwilling to tell anything about the affair. For that reason the State's case is entirely circumstantial.

Ninth Street, one of the southerly streets of the town of Yuma, runs east and west. Its westerly extension intersects the West Main Canal, one of the large irrigation canals of Yuma Valley, about four and one-half miles southwest of Yuma, across which is a bridge used by the traffic on Ninth Street. On Sunday, August 25, 1935, Roy Sutton, a 15 year old boy, discovered on this bridge some blood spots, wisps of hair, and two human teeth. On Monday, the following day, Sheriff Newman of Yuma County and a deputy and others found in the canal, about three-quarters of a mile south from the bridge, the dead body of Bill Allen. The sheriff described the condition of Allen's head as follows:

"On the right side of his forehead there was a big hole in there. You could see his brains. His cheek and eye was all caved in, all gone. The side of his jaw and teeth were all broken up and part of it gone. I don't know how I could explain it any more than to say it was just—the condition of it—

"Q. In your experience have you ever seen any person living with his face so badly beaten up as that one is? A. No."

In the canal, just a few feet downstream from the bridge, was found a rough-surfaced rock, weighing

from fifteen to twenty pounds. On it was human hair and in the crevices what appeared to be skin. Near the bridge was found an impression in the soil into which this rock was fitted. The marks on the rock corresponded with the marks in the hole or impression from which it was thought to have been taken. The hair found on the bridge and on the rock was of the same color as Bill Allen's. There were three spots of blood on the bridge, the one in which the teeth were found being the largest and about seven or eight inches in diameter. On the balustrade or railing on the south side of the bridge were splatters of blood both on the in, and outside, indicating the body had been thrown into the canal from the bridge and after the wounds on face and head had been inflicted and while still bleeding. The blood spots, hair, and teeth were on the southwest corner of the bridge and near the railing.

Just west of the bridge and within a few inches of the southwest end thereof, on the right-hand or south side of the road and south of the line of traffic, were the tracks of two motor wheels. The soil was a sandy loam and the details or pattern of the tires plainly showed on the ground. These tracks appeared on the east side of the bridge, in the road on Ninth Street for a distance of about a half mile, where they mired down in a puddle or pond of water, at which place were also the tracks of two persons, one barefooted and the other wearing tennis shoes. The motor vehicle that made the tracks was occupied by two persons and was at the bridge and crossed it going east between 3 and 4 o'clock in the morning. Between 6 and 7 o'clock in the same morning, three persons drove to where this motor vehicle was stuck, pulled it out, and took it away. Leslie Lawler, who lived nearby, said it was a Model T Ford, without top, with nickel-plated radiator.

Later, on the same or the following day, a Model T Ford, without top, with nickel-plated radiator, was found at what had been the Balsz slaughter-house on Eighth Street in the possession of defendant, the tires of which made the same tracks as found at the Ninth Street bridge and at the mud hole where the car was stuck. Defendant admitted that it was his car. Lawler identified it as the same car that had been stuck near his place on the morning of August 25th. When arrested defendant was wearing a pair of tennis shoes which fitted into the tennis shoe tracks at the mud hole where the motor vehicle was stuck.

"The only difference was just a little piece of mud stuck in the end of the shoe, but the rest of the marks upon the shoe make the same imprint as was the imprint there on the mud."

The defendant and Bill Allen were working for George Beeler near Somerton, threshing alfalfa seed, but on Saturday morning, August 24th, owing to a rain, the operations were stopped. They were together in Somerton later in the day. From Somerton the defendant, Allen, and Jim Scott, also a Cocopah Indian, went in defendant's Model T Ford to John Brown's about two or three miles from Somerton, arriving there after dark. The last time Allen was seen alive and was recognized was by Jim Scott, who said he saw deceased in defendant's automobile at Brown's a little while after they arrived; that Allen rode from Somerton to Brown's in the back seat of the car and was in the car when he last saw him; and that defendant was moving around among the people at Brown's. There was an Indian dance or fiesta at Brown's place, and the evidence was that the defendant left the dance or fiesta about midnight and in his car was another person not identified but "a kind of big, heavy set fellow." The deceased was a large man.

The defendant's defense was an alibi. He contended that he knew nothing about the killing and that he was elsewhere when it happened. The evidence in support of the alibi was so unsubstantial and contradictory, the jury could not do otherwise than reject it. We will take up and consider in their general order the reasons presented and argued by defendant's counsel as to why he was not accorded a fair and impartial trial in accordance with the law.

He was informed against as "George Antone, *alias* George Johnson." He complains that the *alias* description in the information and in the proceedings was prejudicial error. He demurred to the information because of the *alias*. The court very properly overruled his demurrer. Upon his arraignment he gave as his true name George Antone, and although he asserts that "subsequent proceedings" were not carried on in that name, the record shows the contrary. He was sentenced as George Antone.

*"Alias"* or *"alias dictus"* as used here means "otherwise called." 1 Bouv. Law Dict., Rawle's Third Revision, p. 171; *State* v. *Howard,* 30 Mont. 518, 77 Pac. 50. The defendant apparently was known by three names. The witnesses during the trial referred to him sometimes as George Antone and at other times as George Johnson. He testified that his Indian name was Buck-ha-looey. Where a person is known by several names, it has always been the practice to indict him or inform against him under all of such names. We think this is permissible. He may on his arraignment give the name he wishes the proceeding to be carried on in, and it is then, under sections 4979 and 4982, Revised Code of 1928, the duty of the court to have "subsequent proceedings" in that name.

Defendant says he was given the *alias* so as to get it before the jury that he was theretofore charged

under the name George Johnson with murder at Dead Man's Corner, a few miles from Yuma. It was defendant's counsel who brought out that fact in the examination of jurors on their *voir dire,* and whatever the reason for doing so the defendant should not now be permitted to complain. Besides, there is nothing to show that the prosecuting attorney in using the *alias* was not acting in perfect good faith.

■■■■ The court instructed the jury that its verdict should be not guilty or guilty of murder in the second degree and that its consideration should be confined to these two forms of verdict. The defendant at the end of the instructions, through his counsel, said: "We wish formally to request an instruction on manslaughter. That is only to preserve the record." The court refused the request saying: "Yes, and I have considered that very carefully heretofore, Mr. Timmons, and we will deny the request. I think the two forms submitted to the jury are the proper ones to submit in this case in view of the testimony." This ruling is assigned as error. This court has stated that it is the duty of the trial court in homicide cases to instruct the jury on every grade of the offense the evidence tends to show defendant guilty of, and, conversely, that is not the duty of the court to instruct as to other grades of the offense, or grades the evidence shows he could not be guilty of. *Miranda* v. *State,* 42 Ariz. 358, 26 Pac. (2d) 241, 243; *Singh* v. *State,* 35 Ariz. 432, 280 Pac. 672, 67 A. L. R. 129; *Campbell* v. *Territory,* 14 Ariz. 109, 125 Pac. 717, 721. In the last case we said:

"The instructions of the court should be in accord with some phase of the testimony, and should be so framed as to correctly state the law in the light of the testimony." Or putting it otherwise: " . . . manslaughter is included in murder in the first or second degree. . . . But to be ·included in law is not suffi-

cient; it must also be included in fact. . . . 'It was never the intent of the law to submit a possible verdict upon a so-called included crime because included in law. It must be included in fact, and by the facts of the particular case.' " *State* v. *Ash,* 68 Wash. 194, 122 Pac. 995, 39 L. R. A. (N. S.) 611.

When the evidence shows or tends to show that the killing was the result of a sudden quarrel, or was committed in the heat of passion, or that it was involuntary and in the commission of an unlawful act, or the commission of a lawful act without due caution or circumspection, it would be the duty of the court to instruct on manslaughter. Defendant contends that the evidence reasonably permits or authorizes the conclusion that whoever killed Bill Allen did so in a sudden quarrel or in the heat of passion and that the requested instruction should have been given. In the Miranda case we considered whether an instruction on manslaughter should have been given, the evidence of the killing being entirely circumstantial, and came to the conclusion, after reviewing the cases, that when the evidence of the killing "shows a deliberate intention unlawfully to take away the life of a fellow creature or 'an abandoned and malignant heart' on the part of the killer," it is not error to refuse to instruct on manslaughter. In other words, such instruction should not be given if the circumstances of the killing show express malice as where it was done with an ax while the deceased was lying on his side in bed with his face to the wall. We quoted with approval from *Bast* v. *Commonwealth,* 124 Ky. 747, 99 S. W. 978, as follows:

"Where the physical facts . . . are such as to preclude the idea or the possibility that the killing was the result of an accident, or that it was a result of a sudden affray, then the trial court would be warranted in refusing to give an instruction on the subjects of voluntary or involuntary manslaughter."

The evidence here shows that the person who killed Allen did so with a fifteen or twenty pound rock; that he beat one side of his head and face into a pulp or jelly, exposing his brain, and then, in an effort to cover up his awful act, threw the dead or dying man into the canal. This was done at a late hour of the night, in a lonely place. There were no signs of a struggle or a fight. No inference, from the manner of the killing and disposition of the body, that the act might have been voluntary or involuntary manslaughter, could be reasonably drawn but, on the contrary, the jury might well infer that whoever killed Allen had a deliberate intention to take away his life and did it with malice aforethought. The charge in the information is of murder in the second degree and that, of course, limited the instructions to that degree. We think the ruling refusing to instruct on manslaughter, under the facts and circumstances, was correct.

█ Dr. Charles S. Powell testified for the State and, in answer to a hypothetical question as to the cause of Allen's death, said that in his opinion he "came to his death by traumatic injury to his head." The hypothetical question incorporated practically all of the State's evidence as to the finding of blood spots on the bridge and railing; the dead body in the canal; the bruised and battered condition of the face and head; the exposure of the brain; the finding of the rock with hairs and skin in crevices thereof, and the teeth on the bridge; the absence of any evidence of any collision or automobile accident on bridge or in the immediate neighborhood. The question was objected to on various grounds but the court permitted the doctor to answer. Its evident purpose was to prove the cause of Allen's death and whether it was due to the wounds on his face and head or to drowning. For that purpose it would have been enough to describe

his wounds in connection with the blood on the bridge and its railing and the finding of the body in the canal. The inclusion of more of the evidence in the hypothetical question could do no harm. The witness' testimony was directed to the cause of death only and there seems to be no disagreement on that point, although it is insinuated that Allen may have been drowned.

 It is objected that the question called for the conclusion of the witness and that the answer invades the province of the jury. The fact sought to be proved was one for expert testimony of the medical profession and it was not improper to allow Doctor Powell to answer the question. While perhaps the jury without the aid of an expert would know that the wounds on Allen's face and head were sufficient to cause his death, it was perfectly proper to get the expert opinion of the doctor. It is also asserted the hypothetical question was not based on the evidence. That it should be, to be of value or competent, seems to be well settled. The facts recited in the question and necessary to advise the witness of the point inquired about were well supported by the evidence.

 Counsel assert that the court erred in refusing them permission to show that John Brown, called by them as a witness for defendant, was hostile to defendant, and in commenting on the witness' attitude. It was at the home of this witness the dance or fiesta was held Saturday night, August 24th. For some reason, not entirely clear, counsel for defendant, after this witness had stated in answer to their question that he owned and lived on forty acres of land, wanted him to describe such forty acres. This the witness did the best he knew how. He was then asked the direction the road ran to and from his home, where the irrigation ditches were located, and the particular.

part of the forty acres on which his house or houses were situate, and in his faltering Indian way he told them the best he could. Counsel were very persistent, and asked him over and over, when he finally stated: "As I stated in my statement that where I did have built that house, that entertainment was built at the northwest corner, but I am not going to tell you any further. That is all I am going to say." Whereupon counsel said: "You are not willing to give any testimony that would be favorable to the defendant in this case, are you?" This was objected to by the county attorney as improper and the objection was sustained, the court remarking: "I think nothing appears now except a little impatience on the part of the witness, because, as he thinks, he has given a full explanation." Counsel objected to the court's remark as "being a comment on the evidence upon a question that is for the jury to decide." The court then said: "I think it wasn't a comment, but an explanation as to the Court's opinion as to the attitude, when he showed somewhat of anger or impatience." We have carefully read the testimony of this witness and observed the kindly patience of the presiding judge during such examination and the entire trial, and must say the record acquits the court of any unfavorable comment on the evidence. The witness, it should be borne in mind, was defendant's witness and under the rule, defendant having placed him on the stand, vouched for the truthfulness of his testimony. A candid and fair examination of the attitude of defendant's counsel towards this witness will convince anyone that the matters he was being questioned about were in fact more to harass the witness than to elicit anything bearing upon the guilt or innocence of the defendant. Just why this attitude was taken is probably explained by the fact that he had also theretofore been sworn

and testified as a witness for the State. This colloquy that is criticized did not end counsel's examination of this, their own, witness, but they questioned him for many pages on the location of his house and other improvements on his forty acres. The court did not err in its rulings.

Defendant seems to think the court's adverse ruling on his motion for an instructed verdict at the close of the State's case, on the grounds,

"(1) That the *corpus delicti* had not been sufficiently proved; (2) that the defendant has not been sufficiently connected with the offense; (3) that the evidence is insufficient to establish the venue of the offense," was error.

From the evidence, we think no one can gainsay Allen is dead and that he came to his death by the use of violent and criminal means at the hands of another. That being so, the *corpus delicti* has been sufficiently proved. 13 R. C. L. 736, § 40.

There was much evidence connecting or tending to connect defendant with the commission of the offense charged, and its weight and credit were properly, under the court's instructions of which no complaint is made, left for the determination of the jury, and this fact-finding body concluded defendant is guilty. Its decision on the facts, when in dispute, under our rule, is final.

The argument that, because the place where the evidence shows deceased was found is near the boundary of Mexico and California, he might have been killed in one of those places and his body brought into Arizona, is hardly convincing. The circumstances quite conclusively show that an automobile was parked near the west end of the Ninth Street bridge and just south of the line of traffic the night of August 24th, and that such automobile belonged to the defendant;

that it was on the bridge that Allen was beaten to death and his body thrown into the canal; and that the automobile passed over the bridge and proceeded east for a half mile where it got stuck in the mud. There is nothing in the evidence to indicate that Allen was killed elsewhere and his body brought to this point and left. If the cuts on his face and head had been inflicted in Mexico or California, it is very improbable that he would have been bleeding when his body was on the bridge. The blood on the bridge would indi-. cate that it was there where he was killed. The rock found in the canal and the story written on it with the hair and flesh of the deceased locate the venue at the Ninth Street bridge, which is in Yuma county, Arizona.

 It is argued the evidence fails to show defendant had any motive to kill deceased and that in a circumstantial case of criminal homicide motive must be shown. We think the true rule is that it is always competent to show motive but that it is not essential. In *State* v. *Lucey,* 24 Mont. 295, 61 Pac. 994, 996, the rule is thus stated:

" 'Any evidence that tends to show that the defendant had a motive for killing the deceased is always relevant, as rendering more probable the fact that he did kill him.' Underh. Cr. Ev., § 323. This rule is especially applicable to cases like the present, where responsibility for the homicide rests entirely upon circumstantial evidence. 1 McClain, Cr. Law, § 416; *State* v. *West,* Houst. Cr. Cas. (Del.) 371; *People* v. *Ah Fung,* 17 Cal. 377. The presence or absence of it is not conclusive, however, but is to be considered as any other evidentiary fact bearing upon the ultimate question of the guilt or innocence of the defendant, and is more or less significant in the light of the facts of the particular case. The finding of a motive is not indispensable, however. Were this true, it would oftentimes be impossible to secure conviction; for such is the nature of the human heart, and so various are

the springs of action hidden therein, that it is often impossible to fathom it and assign any motive whatever to the act under consideration. Under such circumstances it is the duty of the jury to convict, notwithstanding the lack of proof tending to show motive, if the crime is otherwise clearly established. *Pointer* v. *United States,* 151 U. S. 396, 14 Sup. Ct. 410, 38 L. Ed. 208; *Johnson* v. *United States,* 157 U. S. [320] 321, 15 Sup. Ct. 614, 39 L. Ed. 717.'' See, also, *Evans* v. *Commonwealth,* 230 Ky. 411, 19 S. W. (2d) 1091, 66 A. L. R. 360.

It is suggested by the State that motive was in fact shown. Jessie Escalante, a witness in the case, is a niece of the deceased. A ·short time before the 24th day of August this woman went or was taken by him to defendant's home and remained overnight. Defendant testified that she sought refuge at his home from an abusive husband. At all events, the deceased, her uncle, had something to do with her leaving defendant's home and returning to her husband. The State would draw from this incident the inference that defendant was offended at deceased's interference in the matter and took his life because of it. No one can tell what may have been the inducement to take Allen's life. It may have been some real or some imagined or fancied wrong—the one suggested, or some other. Paraphrasing what the court said in *Evans* v. *Commonwealth, supra:* Society is but little interested in why Antone killed Bill Allen, except as such evidence of why he did it may tend to throw light upon the main question, which was: Did he do it? The jury has said he did. No improper evidence was adduced before it. It was correctly instructed.

The trial was orderly conducted, the evidence supports the verdict, and the judgment entered thereon is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.