216 P.2d 415

**STATE v. THORP.**

No. 999.

Supreme Court of Arizona.

March 27, 1950.

V. L. Hash and Virginia Hash, of Phoenix, for appellant.

Fred O. Wilson, Attorney General, Chas. Rogers and Maurice Barth, Assistant At-

torneys General, James J. Caretto, Deputy County Attorney for appellee.

STANFORD, Justice.

The defendant (appellant) Lloyd Thorp was accused on the 7th day of January, 1949, by the county attorney of Maricopa County, of murder of the second degree alleged to have been committed on the 25th day of December, 1948, the information charging that the defendant "did then and there wilfully, unlawfully and feloniously kill and murder one W. O. Thorp, a human being". W. O. Thorp was the father of Lloyd Thorp. They lived together at 2042 East Jackson Street in Phoenix.

About 7:50 p. m. on Christmas evening, 1948, Tony Silvio, operator of an emergency ambulance service, received a call from the city police department requesting him to go to the premises above mentioned and remove a sick man to the hospital. Upon arriving at the premises Silvio found W. O. Thorp on a bed suffering from bruises and marks about the face and body; found the room in disorder with blood stains on the floor, and upon such findings Silvio refused to remove W. O. Thorp until the police had been notified of the conditions stated. The record shows that the defendant stated that he did not want the police to know anything about it and that they had the means to take care of their father at the hospital. In response to Silvio's call, two deputies from the sheriff's office went to the scene. They searched the house as well as the premises outside. They found nothing outside that would indicate any struggle, but found blood upon the floor of the room in which the father was lying. The injured man was then taken to the hospital accompanied by officers Moore and Stockton. While at the hospital officers found that the clothing of defendant was splattered with blood and that stains of blood were also upon his shoes. They had him to take off his shoes and he was thereupon taken to the sheriff's office and interrogated. W. O. Thorp (the father) died four days later as a result of the injuries received.

Defendant was convicted of manslaughter and sentenced to 5 to 7 years in the state prison. From this conviction and sentence the defendant appeals.

By Assignment of Error No. 1 defendant claims " * * * that the state had wholly failed to establish the corpus delicti of the crime". Assignment No. 2 asserts that there was no evidence " * * * independent of the confession, to prove the commission of any act of violence on the part of defendant toward deceased or that the deceased came to his death as the result of any human agency".

On the subject of corpus delicti, from this court's case of Burrows v. State, 38 Ariz. 99, 297 P. 1029, 1034, we quote: " * * * In a murder case, therefore, the state must prove aliunde the confession, that the person named in the information is dead, and that he has been killed by some

one. Such evidence, of course, may be either direct or circumstantial, but must be clear and convincing to that effect. * * "

The testimony in this case shows that there were fresh wounds upon the body of deceased; that he had bleeding cuts; the room showed that it had blood upon the floor, and that there had been a struggle.

Erstel B. Stockton, a deputy sheriff called to the scene to investigate, gave the following testimony at the trial:

"Q. And what did you do in connection with making your investigation? A. I asked the group what had taken place. Lloyd Thorp says, 'I don't know.' I asked him at that time who he was, and he told me his name and that that was his father. I asked him where he found his father. He said, 'Out there,' motioned. I says, 'Out where?' He says, 'Out there.' I says, 'You mean out in the yard?' He says, 'Out there,' three different answers was 'Out there.' Well, Bill Moore and myself went out in the yard—"

*     *     *     *     *     *

"Q. What did you do after that, Mr. Stockton? A. We went out in the yard to see if there was anything out there.

"Q. And how much of the area did you search there? A. We covered the whole yard and also the street.

"Q. Which street? A. In front of the house.

"Q. Did you go beyond Jackson Street? A. The area of the street.

"Q. And did you go east and west on the street? A. East and west, both ways.

"Q. And did you find anything? A. No.

"Q. And when you—did you then terminate your search? A. We come back to the house.

"Q. And what did you do then? A. We checked the other rooms of the house.

"Q. And did you find anything out of order? A. Nothing, only in the one room.

"Q. What room was that? A. That was the front screen porch.

"Q. The front screen porch. Did you then say anything to Mr. Thorp, the defendant, about that? A. I asked him then again where he was found. He gave me the same answer as before."

*     *     *     *     *     *

"Q. And what type of a room was that? A. It's a small screen porch.

"Q. And on what part of the premises is that? A. That is on the front of the house, which is on the south side.

"Q. On the south side. You say the room was in disorder? A. Yes.

"Q. What did you observe about that? A. There was water on the floor, blood on the floor.

"Q. Where was that blood, where did you see it? A. There was blood on the floor by the bed; there was blood on the west, south, southwest corner, and on the south portion of the wall.

"Q. And with reference to the foot of the bed, did you notice any blood? A. Yes.

"Q. And where was that? A. That was on the floor also.

"Q. Well, how far from the foot of the bed? A. Oh, probably three or four feet."

By the foregoing we have covered the first and second assignments of error. The testimony applied to the law is sufficient proof of the establishment of the corpus delicti, and defendant's conviction therewith independent of the confession.

▆▆▆ Assignment No. 3 is that the confession obtained from defendant was obtained by compulsion or force, and by denial of defendant's constitutional rights, and Assignment No. 4, treated with Assignment No. 3, is that the shoes, pants, coat and shirt of defendant " * * * were taken from the person of the defendant against his will and without his consent and he was stripped of his clothing by force by the officers."

Supporting these assignments defendant quotes from Lyons v. State of Oklahoma, 322 U.S. 596, 64 S.Ct. 1208, 1212, 88 L.Ed. 1481: " * * * The voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused, at the time he confesses, is in possession of 'mental freedom' to confess to or deny a suspected participation in a crime."

The attorney general directs our attention to this court's case of State v. Miller, 62 Ariz. 529, 158 P.2d 669, 672 quoting: "The criminal code makes it the duty of an officer, when he arrests a person by virtue of a warrant, to take the defendant before a magistrate without unnecessary delay. The same rule applies when an arrest is made without a warrant. In such a case, the defendant must be taken before the nearest or most accessible magistrate. A private person who makes an arrest is under the same duty. Sections 44-107, 44-140, 44-141, A.C.A.1939. The law does not in terms prevent either a prosecuting attorney or a peace officer from securing statements from a defendant after his arrest, and prior or subsequent to his arraignment, but the introduction of such statements in evidence can be upheld only where they are wholly voluntary."

It is the claim of defendant that when he made the statements, or confession, referred to, that the defendant, " * * * was goaded into making the statements which were testified to by officers Moore and Stockton. Seizing his clothing at the jail, compelling him to remove his shoes and walk through the slush in the winter, and threatening him constantly were sufficient acts to intimidate him. These facts clearly establish that any statement he made was not free and voluntary. Such conduct on the part of officers has been highly criticized in Evans v. State, 106 Ga. 519, 32 S.E. 659, 71 A.L.R. [Am.St.Rep.]

276; Duren v. Thomasville, 125 Ga. 1, 53 S.E. 814; State v. Sheridan, 121 Iowa 164, 96 N.W. 730."

Among other cases cited by defendant is this court's case of Lee v. State, 27 Ariz. 52, 229 P. 939 where, quoting from defendant's brief: " * * * the court held that where the shoes of an accused person were removed without objection and in the absence of compulsion, then they were admissible. On the other hand, if there was compulsion, then they are not admissible."

The testimony of Bill Moore, deputy sheriff, shows the following:

"Q. Then did you then bring him up to the sheriff's office? A. Yes, sir.

"Q. And what did you do when you got him to the Sheriff's office? A. We sat around there for a little while and then we talked to him some more about it and told him we believed he knew what had taken place.

"Q. Did you make any promises to him at that time? A. No, sir.

"Q. Did you threaten him in any way? A. No, sir.

"Q. And did you exercise any force on him? A. No, sir.

"Q. And the statements that he made at that time, were they made voluntarily? A. They were."

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. What was that conversation?

&ast; &ast; &ast; &ast; &ast; &ast;

"A. I asked him to state what had happened.

"Q. Did he make any statement? A. Yes.

"Q. What did he say? A. He made the statement in this way, he said, 'You guys want to know if I did it. I say I did.' He said, 'Now, that is what you want to know, isn't it?' We asked him I asked him, I said I would like to know why he did it.

"Q. Was that the extent of it? A. No, he said, 'That is what you want to know.' He said, 'Now, I have told you that I did it. Now what do you want to do about it?' And I told him I didn't want to do anything, I'd leave it up to the Court to do.

"Q. Did he make any statements as to why he had done it? A. Yes, he said he said something about his deceased wife he didn't like.

"Q. That who had said something? A. His father had said something about this deceased wife he didn't like.

"Q. Did he say anything after that? A. Yes.

"Q. Relate what happened. A. He said that he done it, he was sorry he done it, but if he said it again, he would do it again.

"Q. Well, did he say what he did? A. He said he knocked him down and stomped him."

The testimony of Stockton is about the same as that of Moore as to the confession.

The latest expression of this court on the subject of a confession is set forth in

our case of State v. Johnson, 69 Ariz. 203, 211 P.2d 469, 471. We quote: "The law on when confessions are admissible in situations such as this is well established in this jurisdiction. (Citing cases.) The admissibility of a confession depends on whether or not it was freely and voluntarily made. The admissibility in the first instance is necessarily a question of law for the trial judge. If it is received in evidence it is for the jury to determine whether the confession was freely and voluntarily made. In the case at bar there was no showing by defendant of it's being involuntarily made. * * *"

■ The testimony further shows that after they left the room where the father was found they took the defendant to the hospital where the father had been taken and took him into the hall leading to the emergency room and at that time Deputy Sheriffs Stockton, Moore and McGovney had a conversation with the defendant, Mr. McGovney doing the questioning. Erstel Stockton testified that on that occasion no force or duress was exercised on the defendant, nor was any inducement given to him. In reference to the shoes of defendant witness Stockton was asked this question:

"Q. Did Mr. McGoveny then get some shoes from him? A. Yes, he did.

"Q. Did the defendant voluntarily give those up? A. Yes.

"Q. State what was said and what was done? A. The question was asked by myself to McGovney that it was my opinion that we should have the shoes, McGovney turned to Mr. Thorp and asked him to pull off his shoes. Mr. Thorp sat down on the edge of the bed and pulled them off and handed them to Mr. McGovney.

"Q. What did you do after that? A. After that we taken the shoes, and I taken Mr. Thorp in my car and come in to the office."

When taken to the sheriff's office certain clothing was given by the defendant to the officers and we find the testimony to be that the clothing was voluntarily given.

Here is a case where officers had testified that they saw blood upon the shoes and cuffs of the trousers. It would have been the duty of any officer to protect that evidence if the shoes and clothing could be lawfully obtained. We see nothing in the case that would indicate that the substantial rights of defendant were in any way invaded by the admission of this clothing in evidence.

■ By the fifth assignment of error defendant claims that exhibits, to be admissible, must tend in some way to prove the ultimate fact and nothing could be proved by these two exhibits in question, a watch and a leather watch strap. The strap in question was about 7 or 8 inches in length. This court has observed the exhibits and finds the glass on the face of the watch to be broken. The testimony shows that it was in the bed and the ring that held the leather strap was gone. In our opinion it

would be of aid in determining the case. The admission of these two articles would in no manner prejudice the rights of this defendant.

 The sixth, or last assignment of defendant's is to the effect that the court erred in permitting witness W. A. Moore to testify for the reason that his name was not indorsed upon the information. After this witness had finished his testimony counsel for defendant made a motion to strike his testimony because his name was not indorsed upon the information. The name indorsed on the information was "L. M. Moore", whereas at the trial the witness gave his initials as W. A. Moore. The evidence discloses that he is the identical person who testified upon the preliminary hearing. In denying the motion the trial court said, "I think, Mr. Hash, you have waived that by letting all that testimony go in. The motion is denied." In State v. King, 66 Ariz. 42, 182 P.2d 915, 919, we held that "no person is made ineligible or disqualified as a witness by virtue of the fact that his name is not endorsed on the information." In that case it was pointed out that if a witness be called whose name is not indorsed on the information the defendant cannot be heard to complain if he does not announce surprise and is not able to convince the court that in view of all the circumstances it would be unjust to compel him to proceed in his defense. In that case we said, "* * * For a defendant to suggest surprise upon being confronted with his alleged victim is naive to say the least. * * *" That observation is clearly applicable here. There is no merit to the assignment.

 The court holds that the defendant had a fair and impartial trial by jurors drawn from the body of the county and the jury has said that from the evidence and the law that he was guilty of the crime of manslaughter. We find no prejudicial error.

The judgment is affirmed.

LA PRADE, C. J., and UDALL, PHELPS and DE CONCINI, JJ., concur.