275 P.2d 408

**STATE of Arizona, Appellee,**

v.

**Arthur THOMAS, Appellant.**

**No. 1045.**

Supreme Court of Arizona.

Oct. 18, 1954.

W. Edward Morgan, Tucson, Hayzel B. Daniels, Phoenix, and I. B. Tomlinson, Bisbee, for appellant.

Ross F. Jones, Atty. Gen., William T. Birmingham, Asst. to the Atty. Gen., and W. E. Polley, County Atty., Cochise County, Bisbee, for appellee.

UDALL, Justice.

Arthur Thomas, defendant-appellant herein, was convicted of the murder of one Janie Miskovich and the death penalty was imposed. He has appealed from the judgment and the order denying his motion for a new trial contending that the proceedings were not fair and impartial nor in accordance with law.

Before setting forth the pertinent facts adduced at the trial we shall consider sever-

al preliminary matters which the defendant assigns as error.

## Motion for Continuance

On April 17, 1953 (all of the events herein mentioned occurred during the year 1953) the case was set for trial on June 1st. On that date, with a large panel of jurors present and with witnesses who had been subpoenaed from distant points in attendance, the defendant made an oral motion for a continuance in order that a sanity hearing might be held. The court's denial of this motion is assigned as error.

In support of his motion counsel stated to the court that defendant within the past 48 hours had informed him that he was unable to remember any of the events leading up to or concerning the commission of the offense charged, and this caused counsel to have serious doubts as to his client's sanity. It was requested that the court appoint two experts to examine the defendant as to his present mental condition.

■■ There are two ways in which the sanity of a defendant in a criminal case may be brought in question. If the defendant was allegedly insane at the time of the commission of the offense, this issue may be litigated as defensive matter by complying with the provisions of Rule 233, Rules Cr. Proc. (now appearing as Sec. 44–1031, A.C.A.1939). If the defendant is allegedly insane at the time of trial, and hence under the common law not triable during the period of insanity, the issue is raised by the

method prescribed by Rule 304, Rules Cr. Proc. (Sec. 44–1701, A.C.A.1939):

"* * * If before or during the trial the court has reasonable ground to believe that the defendant * * * is insane, or mentally defective, to the extent that he is unable to understand the proceedings against him or to assist in his defense, the court shall immediately fix a time for a hearing to determine the defendant's mental condition. The court may appoint two (2) disinterested qualified experts to examine the defendant with regard to his present mental condition and to testify at the hearing. * * *"

■ Counsel's statement to the court, unsupported by other evidence, was not such reasonable grounds as to require the court to believe the defendant insane and that proceedings under this statute should be instituted. Counsel argues that the trial judge as yet had not seen the defendant, and hence his action in denying the motion was arbitrary and deprived him of a fair trial.

The case of Fralick v. State, 25 Ariz. 4, 212 P. 377, so strongly relied upon by defendant, is readily distinguishable. We there reversed the trial court's refusal, on motion timely made, to submit to the jury, pursuant to statutory provisions then in force, 1913 P.C. §§ 1264–1269, the issue of defendant's present mental condition, where the request was supported by affidavits of defendant's mother, brother-in-law, and family doctor. In the instant case no sup-

porting evidence was submitted nor was the issue again raised. During the long drawn out trial (16 days) the court had ample opportunity to observe the defendant and, had this conscientious judge thought there was reasonable ground for such action, undoubtedly he would have stopped the proceedings and ordered the requested hearing. On this record we hold there was no abuse of discretion in denying the motion.

## Change of Venue

It is urged that the action of the trial court in denying defendant's motion for change of venue deprived him of a fair and impartial trial. Counsel contends that on account of the publicity the case had received the feelings of the people of the county were aroused and because defendant was a Negro and the decedent was a white woman such strong prejudice existed that an impartial jury could not be obtained. In support of this contention defendant had previously filed his affidavit and that of one of his attorneys. When the motion was argued on the day the trial commenced, 18 additional affidavits, all obtained from the town of Douglas and 90% signed by Negroes, were presented. In opposition the state presented 274 affidavits of citizens from every part of the county asserting that defendant could obtain a fair trial in Cochise County.

██ The rule in this jurisdiction is:

"Whether the application (for a change of venue) should have been

granted is largely a matter of discretion of the trial court which we will not disturb unless it clearly appears that such discretion was abused. * * *" Burgunder v. State, 55 Ariz. 411, 103 P.2d 256, 261.

██ The ease with which a jury was impaneled makes it clear that defendant was not deprived of a fair and impartial trial on this score. The record shows that in obtaining a panel of 32 jurors and three alternates a total of only fifty veniremen were examined. Of the fifteen excused four were challenged for bias and prejudice, the other eleven having been ordered to step aside for entertaining conscientious scruples against the infliction of the death penalty. The following statement seems apropos:

"* * * It is our observation that most people are essentially honest. It is not indulging in presumptions to assume that most if not all jurors who qualify do so honestly and with no secret reservations to promote an evil or dishonest interest. A trial judge may, after denying a motion for change of venue, reverse his ruling at any stage of the proceedings prior to the actual selection and swearing of the jury, if he discerns or becomes convinced that there is skullduggery afoot, and that prejudiced, biased and partial individuals are attempting to qualify as jurors to the preclusion of reasonably securing a fair and impartial

jury." State ex rel. Sullivan v. Patterson, 64 Ariz. 40, 165 P.2d. 309, 314.

There was no abuse of discretion in denying a change of venue.

### Impaneling Jury

■ Defendant urges that the trial court erred in sustaining the State's challenge for cause of several veniremen who flatly stated on voir dire examination that they would not under any circumstances vote for the infliction of the death penalty even if convinced defendant was guilty of murder in the first degree. He points out that the entertaining of conscientious scruples against the infliction of the death penalty is not one of the eleven grounds enumerated as grounds of challenge to individual jurors for cause under Rule 274, Cr.Proc., Sec. 44–1313, A.C.A.1939. Defendant contends that since Section 5035 of the 1928 Revised Code, providing in part:

"Either party may challenge any individual juror for the following causes:

\* \* \* \* \* \*

"14. if the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty, in which case he must neither be permitted nor compelled to serve as a juror",

does not appear in A.C.A.1939, it has been repealed and therefore at present there is no basis for sustaining such a challenge. In this he is in error, for when confronted with a similar contention in the case of Chitwood v. Eyman, 74 Ariz. 334, 248 P.2d 884, we held that the adoption in 1940 of the Rules of Criminal Procedure did not effect repeal of a pertinent section of the Revised Code of 1928 relating to criminal procedure, even though such section was not carried forward by the compiler into Annotated Code of 1939. This ruling is controlling here, hence we are not persuaded by the decisions of other appellate courts such as found in the case of State v. Lee, 91 Iowa 499, 60 N.W. 119, so strongly relied upon by defendant.

■ Defendant further complains that the court, having sustained the challenge to jurors who indicated they were opposed to capital punishment, should then have sustained challenges made by him to veniremen Nichols and Gilardone since both said veniremen showed a mind so prejudiced that they would not consider, regardless of the evidence, anything less than a death sentence in the event of a finding that the defendant was guilty of first degree murder.

While there are portions of the testimony of such jurors, which if taken alone might give rise to a different inference, we believe the testimony of each of such jurors as a whole justifies the rulings complained of. For analogous situations and a comparable ruling, see: Leigh v. Territory, 10 Ariz. 129, 85 P. 948; Marquez v. Territory, 13 Ariz. 135, 108 P. 258; Burnett v. State, 34 Ariz. 129, 268 P. 611; Riley v. State,

50 Ariz. 442, 73 P.2d 96; State v. Brady, 66 Ariz. 365, 189 P.2d 198.

Furthermore it would seem that by stating "I pass the juror" defense counsel waived this objection insofar as juror Gilardone—who was examined at great length—was concerned.

## Corpus Delicti

 From the evidence it cannot be gainsaid that Janie Miskovich is dead and that she came to her death by the use of violent and criminal means at the hands of another. This much is conceded in defendant's opening brief, yet he incorrectly maintains that the corpus delicti was not established. The true meaning thereof is succinctly stated in 14 Am.Jur., Criminal Law, section 6:

"Generally speaking, the term 'corpus delicti' means, when applied to any particular offense, that the specific crime charged has actually been committed by someone. It is made up of two elements: (1) That a certain result has been produced, for example, a man has died or a building has been burned; and (2) that some person is criminally responsible for the act. It has been said that the corpus delicti consists of the facts that a crime has been committed and that the defendant was implicated in the crime. This definition, however, is inaccurate, since if true, all that would be necessary to convict of a crime would be to prove the corpus delicti."

To the same effect see also, 23 C.J.S., Criminal Law, § 916, and the rule as correctly stated in the following decisions from this court, viz.: Burrows v. State, 38 Ariz. 99, 297 P. 1029; Antone v. State of Arizona, 49 Ariz. 168, 65 P.2d 646; State v. Thorp, 70 Ariz. 80, 216 P.2d 415. We expressly overrule the erroneous statements appearing in the following cases: Edwards v. Territory, 8 Ariz. 342, 76 P. 458; State of Arizona v. Benham, 58 Ariz. 129, 118 P.2d 91; and State v. Lantz, 72 Ariz. 115, 231 P.2d 454, to the effect that one of the elements of the proof of corpus delicti is to establish the "criminal agency of the person charged with the crime * * *."

## Facts Tending to Connect Defendant with Crime Charged

A synopsis of the salient features of the evidence must necessarily be based upon that adduced by the State, since, as was his right, the defendant did not elect to testify. Only two witnesses were called in his behalf, viz., a newspaper reporter-photographer who identified a picture of the defendant taken in the county jail, which picture showed a well-defined welt on defendant's neck, and Highway Patrolman Selchow. The latter merely testified as to a certain incident occurring at the time defendant was apprehended.

The State necessarily depended upon circumstantial evidence to connect defendant with the murder as there were no eyewitnesses to the killing. However there was considerable evidence upon which the State

relied leading to the conclusion that defendant was guilty of the premeditated murder of Janie Miskovich, a middle-aged widow. Though there may have been some conflict in details the evidence will be stated in the light most favorable to a sustaining of the jury's verdict.

Stripped of all the immaterial matters which clutter the voluminous record (2616 pages), the following is a succinct statement of the facts established at the trial:

Around 10:00 a. m., March 17, 1953, a Mrs. Bonnie Fraker called at "The Hitching Post", a grocery store operated by the decedent in the area of Cochise County known as Kansas Settlement which lies about 12 miles south of Willcox, for the purpose of delivering milk. She discovered smoke coming out from under the door and fire in the bed in the back room and immediately drove her car to a nearby building then under construction to summon aid. In response to her request, three workmen including the defendant returned to the store and the fire was extinguished, with but little if any help from defendant. The latter was heard to say that he couldn't stand the smell of burning flesh and the inference is permissible that this remark was made before the presence of the body had been discovered.

An examination of the interior of the store building showed the cash drawer was open, some small coins were scattered about, and numerous blood spots appeared throughout the building. It appeared that some object had been dragged across the floor from the cash register to the back room of the store where decedent lived alone and there a body was found.

The charred body, identified as that of Mrs. Janie Miskovich, was found lying on her bed in the back room of the store. The mattress had been nearly consumed by a smoldering fire. More coins were found near the bloodstained bed. Two purses hanging near the bed were open and empty.

The medical examination showed that while deceased had received blows to the head from some blunt instrument death had resulted from two stab wounds in the heart. A large butcher knife slightly bloodstained was found on a meat block at the rear of the store.

Investigating officers followed a trail of blood spots out the back door of the store and over some adjacent hard ground to a point where they found footprints appearing in the soft soil of a plowed field. One of these officers followed this trail of footprints with accompanying blood spots a distance of approximately a half a mile to a point near the barracks-type house where defendant and several other laborers and their families lived. Further bloodstains were found just outside as well as within the barracks.

Several witnesses testified that the 13½-inch footprints evidenced that they were made by shoes with smooth soles and the heels dubbed or "worn off" at the backside. A pair of brown suede shoes taken from un-

der defendant's bed at 7 p. m. on March 17th—identified as being the only footwear belonging to defendant—were introduced in evidence. They match the footprints described above both as to length and the condition of heel and sole.

Two bloodstained canvas gloves were later found, one in an old stove immediately outside these living quarters, and the other in the open pit of a privy near the house and on the trail of footprints and bloodstains the officers had followed. Both of these were gloves for the right hand and of the brand and style sold to Mrs. Miskovich at 9:00 p. m. on the night of her death by a salesman—the last person to see her alive—who testified the gloves he then delivered were the only canvas gloves in the store. It was shown that in the supply of gloves remaining in the store the next day there were two left-hand gloves for which there were no mates. The glove found in the outhouse contained cuts across the little finger and deeper cuts across the next two fingers. When defendant was apprehended it was found that his right hand had been cut, the cuts extending across the last three fingers. Medical examination revealed that the little finger and ring finger were severely lacerated and that the tendons of these two fingers had been severed. An expert from the Federal Bureau of Investigation testified that an analysis of bloodstains taken from objects and the floor by decedent's bed and from the kitchen floor in the barracks, as well as those obtained from the canvas gloves, were left by type "A" blood as were the bloodstains on a piece of Kleenex removed from defendant's wounded hand by the doctor who treated it.

Between 3:00 and 4:30 p. m. of the day preceding the discovery of the body, defendant purchased some wine, beer and candy in the store. At about 6:30 p. m. defendant and Ross Lee Cooper—a 17-year-old Negro, and one of the inhabitants of the barracks—left their quarters to "go to the store". Defendant and Cooper returned to the barracks within a short time and immediately left for the avowed purpose of going to see one "Louis Max". They returned from this trip in about thirty minutes and Cooper, according to the testimony of two other occupants of the barracks, did not leave again that night. Defendant Thomas thereafter left by himself and was gone for about three hours. There was testimony from which the jury might infer that the homicide took place between the hours of 10:00 and 11:00 p. m.

On the night before the body was discovered, defendant was wearing his usual work clothes which were the only clothes he owned. The next morning he put on an old and worn pair of overalls belonging to some one else. There was no evidence adduced as to what became of his clothes. When he returned to the barracks around noon he removed the brown suede shoes and placed them under the bed where they were later found. He then put on an old pair of shoes, which he had found in a trash

can, from which he cut the backs (counters) as they were much too small for his feet.

That afternoon a search was instigated for the unknown killer by Sheriff Howard aided by a number of other peace officers, on foot, and some local ranchers at least two of whom were mounted. The defendant was apprehended one and one-half miles south of the store and off the road a distance of some 300 yards, under a mesquite bush and partially hidden under a pile of tumbleweeds. He was then questioned and in response denied killing the decedent, but said he knew who did and named Ross Lee Cooper. He also denied having changed shoes and claimed that he had "cut his hand on a can".

When taken before the Justice of the Peace in Warren the following morning he admitted that he had "killed the woman".

■ In the face of this evidence defendant now urges that the "* * * evidence failed to disclose any connection of the defendant with the homicide." While there remain some further assignments to consider, it would appear that the statement in Antone v. State of Arizona, 49 Ariz. 168, 65 P.2d 646, 651, supra, is apropos and fully answers this contention:

"There was much evidence connecting or tending to connect defendant with the commission of the offense charged, and its weight and credit were properly, under the court's instructions of which no complaint is made, left for

the determination of the jury, and this fact-finding body concluded defendant is guilty. Its decision on the facts, when in dispute, under our rule, is final."

Rulings on Evidentiary Matters

First, it is urged that it was error for the court to permit Sheriff Jack Howard and Undersheriff Verl McRae to remain in the courtroom and subsequently testify after defense counsel had invoked the rule for the exclusion of witnesses. It should be noted that the county attorney who personally conducted the prosecution in which he was asking for the death penalty, due to an injury was lying unprotected on a stretcher, encased in a body cast.

■ While we have no statute or rule of court governing this matter (except as to preliminary examinations—Section 44–315, A.C.A.1939), from time immemorial this salutary practice, which was devised for the discovery of the truth and the detection and exposure of falsehood, has prevailed. See, Territory of Arizona v. Dooley, 3 Ariz. 60, 78 P. 138, and Riley v. State of Arizona, 50 Ariz. 442, 73 P.2d 96. In the Dooley case the pronouncement, which has since been consistently followed, was first made that "this is solely a matter of discretion."

In 23 C.J.S., Criminal Law, § 1010, it is stated:

"* * * as a general rule, a party is not entitled to an order of ex-

clusion as *a matter of right,* and the order may be refused if the court, in the exercise of a sound discretion, does not deem that there are sufficient grounds therefor. * * *" (Emphasis supplied.)

 Furthermore there are particular classes of witnesses customarily exempted from the operation of the exclusion rule. See, 23 C.J.S., Criminal Law, § 1011. These include, if the court so directs, a complaining witness, a sheriff (whose statutory duty in Arizona requires him to attend court sessions, Sec. 17–601, A.C.A. 1939), and the peace officer assisting the prosecutor in presenting the case for the State. In the instant case Sheriff Howard was the complaining witness and Undersheriff McRae had throughout been the chief investigating officer and the custodian of the exhibits. Furthermore there was no showing that there was a prejudicial result from these witnesses remaining in the courtroom. We hold that no abuse of discretion appears from this record.

Several assignments deal with Dr. Saba's testimony describing the injuries to defendant's hand and identifying the Kleenex bandage taken therefrom. At about 9:00 p. m. the day defendant was arrested, Undersheriff McRae took him to Dr. Saba, the county physician, as McRae said for the purpose of thereafter testifying as to the nature of the wounds, whereas the Doctor understood the primary purpose was to treat the injured hand. Be that as it may all are agreed that the Undersheriff was at all times present when the defendant was being treated and there is some evidence that other deputy sheriffs were in and out of the room. Counsel urges that since Dr. Saba did in fact treat the wound, the physician-patient relationship existed and his testimony concerning information acquired during the examination to enable him to prescribe for the patient was privileged under the provisions of Section 44–2702, A.C.A.1939.

" "* * * The express object (of the statute) is to exclude the physician's testimony, at the patient's option, respecting knowledge gained at the bedside, in view of the very delicate and *confidential nature of the relation* between the parties. * * *'" Arizona Eastern R. Co. v. Matthews, 20 Ariz. 282, 180 P. 159, 164, 7 A.L.R. 1149, quoting from Arizona & N. M. Ry. Co. v. Clark, 235 U.S. 669, 35 S.Ct. 210, 59 L.Ed. 415. (Emphasis supplied)

Cf. Garcia v. State, 35 Ariz. 35, 274 P. 166.

 For information acquired by a physician to be privileged it must have been acquired under circumstances from which it appears that the examination was intended to be privileged. Cf. Wigmore on Evidence, Third Edition, Vol. VIII, para. 2381. When third persons are casually present their very presence neutralizes the confidential character of the interview and the privilege should not attach. In re

Swartz' Will, 79 Okl. 191, 192 P. 203, 16 A.L.R. 450. The information acquired by Dr. Saba in his examination of the defendant's hand was readily discernible to all those present. We hold that under such circumstances the testimony objected to was not privileged.

Counsel also contends that testimony concerning the similarity of blood types of the stains upon the Kleenex bandage, and the gloves and other objects are inadmissible, being too remote and highly prejudicial. In a number of cases evidence of blood-grouping tests have been held to be admissible in criminal prosecutions to establish identity or guilt.

Confronted with a similar problem the Supreme Court of Maryland said:

"The objection of remoteness goes to the weight of the evidence rather than to its admissibility. To exclude evidence merely because it tends to establish a possibility, rather than a probability, would produce curious results not heretofore thought of." Shanks v. State, 185 Md. 437, 45 A.2d 85, 89, 163 A.L.R. 931. See annotation thereto, entitled Blood Grouping Tests, 163 A.L.R. 939 at 952, 953.

 Defendant further assigns as error the admission of certain exhibits taken from the person or premises of the defendant without his consent or a valid search warrant, urging that these items were obtained in violation of illegal search and seizure provisions of the Federal and State Constitutions, Const.U.S. Amend. 4; Const. Ariz. art. 2, § 8. The law is settled in this jurisdiction that the fact that evidence was obtained by illegal search and seizure does not affect its admissibility. State v. Frye, 58 Ariz. 409, 120 P.2d 793. Counsel argues that since in the Frye case, supra, the evidence was obtained under an invalid warrant, the rule should be limited to cases where the officer was acting in good faith although illegally. We cannot agree with this contention, but feel that the reasoning of the Frye case, supra, applies here. We hold that the evidence objected to was properly admitted.

Defendant next contends that the court erred in admitting in evidence certain photographs. He objects to a photograph of the upper portion of the decedent's naked body taken at the morgue before the autopsy was performed, contending that its only purpose was to inflame the jury, and that it tended to mislead the jury since it did not show the body as found because the burnt clothing was removed before the picture was taken.

 This court has considered the admissibility of photographs of decedent's body in homicide cases several times. We have held such photographs admissible for the purpose of aiding the jury to fix the punishment, Janovich v. State, 32 Ariz. 175, 256 P. 359; to show the wounds which caused the death, Young v. State, 38 Ariz. 298, 299 P. 682; to corroborate the state's theory of how and why the murder was

committed, Burgunder v. State, 55 Ariz. 411, 103 P.2d 256.

■ We believe that the photograph in question was properly admitted for the purpose of showing the wounds which caused the death, and the identity of the decedent.

We have examined the other photographs objected to and the testimony pertaining thereto. The information concerning perspective elicited on cross-examination went to the weight and not the admissibility of the photographs in evidence.

### Judicial Confession

Defendant assigns as error the ruling permitting Justice of the Peace Frazier to testify before the jury relative to what occurred when the defendant was first brought before him. It appears that at 10:00 a. m. of the day following his arrest defendant was taken by Sheriff Howard for a preliminary examination before this magistrate in his courtroom at Lowell. No one was present during this examination but the court officials, the defendant, the sheriff and one of his deputies. We will set out Judge Frazier's uncontradicted testimony as to what ensued:

"Q. Will you state what was said to the defendant, if anything, relative to his rights? A. He was there on the charge of murder. I read the complaint to him and told him that he had a right to a preliminary hearing in the Justice Court, or he might waive that right and have his hearing in the

Superior Court. I told him he had the right to employ an attorney to assist him in preparing his case, and that he would be allowed a reasonable length of time for the preliminary hearing, and he said, 'I don't need any lawyer. I am guilty. I killed the woman.'

"* * * (On cross-examination):

"Q. And you didn't ask him if he killed the woman? A. After I read the complaint to him and he stated that he was guilty, that he did kill the woman, I asked him if he killed her with an ax. He said, 'No. I killed her with a knife.'"

A preliminary hearing having been thus waived the defendant was held to answer to the superior court and his bail fixed at $25,000.

Counsel argues that this testimony should have been excluded for two reasons: (1) upon the theory that the rule should apply which holds a plea of "guilty" withdrawn by leave of the trial court may not be shown at the subsequent trial of the cause; (2) that the statements of the defendant before the magistrate were not voluntarily made and hence were admitted in violation of the privilege against self-incrimination.

■ We are unable to perceive how, under the facts of this case, defendant can invoke the rule set forth under the first proposition. Under our law—as complied with by Judge Frazier—the duty of the magistrate, when a defendant in a felony case is first brought before him, is to:

"* * * immediately inform him (a) of the charge against him, (b) of his right to the aid of counsel during the preliminary examination, and (c) of his right to waive such examination." Rule 39, Cr.Proc., Sec. 44–302, A.C.A. 1939.

We held in the case of State v. Coursey, 71 Ariz. 227, 225 P.2d 713, 717, that:

"* * * there is no such thing as an 'arraignment' in a preliminary hearing, as no plea of 'guilty' or 'not guilty' is required."

In the instant case the apparently voluntary words of the defendant, "I don't need a lawyer, I am guilty, I killed the woman", not only had the effect of waiving the right to a preliminary hearing, but also were an independent, unrequired admission of guilt. Of course the words were not conclusive of his guilt; they were simply a confession, judicial because made in court, and the admissibility of the statement is governed by the law of confessions.

"It is well settled that any statements made by a defendant prior to his trial, having the effect of an admission, connecting him with the act, and likewise a confession that he committed the act, whether judicial or extrajudicial, if made without coercion, duress, or hope of reward, may be used by the state in evidence as a part of its original case upon the defendant's trial for the offense charged." West v. State, 24 Ariz. 237, 208 P. 412, 417.

Counsel strongly relies upon Wood v. United States, 75 U.S.App.D.C. 274, 128 F.2d 265, 141 A.L.R. 1318, wherein it was held that a plea of guilty to a robbery charge entered at a preliminary hearing should not have been admitted at the trial. It was shown that the defendants had pleaded guilty to three misdemeanor charges just prior to the preliminary hearing, but defendants testified they did not know a preliminary hearing had been held, and that at no time did they knowingly plead guilty to the robbery charge, although under the rules of procedure there in force a "plea" is required at a preliminary hearing. Further it appeared that defendants were not represented by counsel, nor was one appointed for a month thereafter. There was no showing they were cautioned or informed concerning their rights. Because of the difference in procedure and the substantially different facts, we feel that case is not in point.

As to the proposition that this confession was involuntary counsel contends that because two confessions made by defendant subsequent to the preliminary examination were found involuntary it necessarily follows that the judicial confession was likewise involuntary. At the trial evidence was first presented in the absence of the jury on the issue of the voluntariness of all the statements made by defendant. It will be recalled that defendant was apprehended hiding in a pile of tumbleweeds. Deputy-sheriff Brashear ordered him to come out and defendant crawled from his

hiding place on his knees with his hands in the air. By the time defendant had been searched while lying on the ground, the sheriff arrived on the scene and ordered defendant to stand and informed him that he was under arrest. While the sheriff questioned his prisoner, Highway-patrolman Selchow handcuffed him. At this time a noose was thrown around defendant's neck by a mounted rancher (identified at the trial as one Bob Macomb) and the defendant was led by the rope for about fifteen or twenty feet. Sheriff Howard testified that he took the rope off the defendant's neck and said "Stop that. We will have none of that." Highway-patrolman Selchow on the other hand testified:

"Somewhere from behind me, a rope was thrown over (defendant's) neck and he was pulled back into me, and we stumbled a little bit, and I had a hold of the rope, and then Mr. Howard came around me, and I said, 'Jack, this is no way to handle this.' Mr. Howard went on to the rope and took ahold of it. At that point he says, 'Will you tell the truth, or I will let them go ahead and do this', or, 'I will go ahead and let them use this.'"

and the next that he saw the rope had been removed and defendant had been taken to the sheriff's car.

Defendant accompanied the officers to the place where he had indicated Ross Lee Cooper, on whom he blamed the crime, might be found. When first seen by the officers Cooper was some distance away working in the fields. Before the sheriff could reach him another mounted rancher (one Gus Arzberger) had roped him and led him to the car. The sheriff removed the rope and Cooper was handcuffed. Defendant got out of the car, and while standing near Cooper both were encompassed by a rope thrown by the same horseman and jerked to their knees or to the ground. The sheriff again removed the rope, but Arzberger then roped Cooper around the neck and he fell to the ground. Finally defendant and Cooper were placed in the sheriff's car and taken to Willcox in search of the local magistrate. As he could not be found, they were then taken to the mortuary and shown the body of decedent. The party then proceeded to the county seat at Bisbee where, because of the county attorney's physical condition, defendant and Cooper were questioned in his home before being taken to jail. After the preliminary examination the next morning defendant was again taken to the county attorney's home and the first extra-judicial confession was made. Two days later a second confession was made at the county attorney's office. Later, both of these confessions were typed and were initialed or signed by defendant.

The trial court ruled out these two confessions because they were so tainted by the abuse of the prisoners here related as to be involuntary. Counsel argues that the judicial confession was likewise so tainted and should have been excluded. As we have heretofore said:

68

"Under the law, it was the duty of the trial court, * * * to investigate the circumstances under which it (the confession) was made, and to that end hear the testimony * * * and thereupon to determine whether the evidence was extorted or free and voluntary; and *his decision upon that question will be respected by the appellate court, unless it clearly shows that it was made in disregard of the facts. * * *"* (Emphasis supplied) Galas v. State, 32 Ariz. 195, 256 P. 1053, 1054.

■ The admitted confession was made in the calm atmosphere and sanctity of an open court hearing after the statutory safeguards had been complied with. The circumstances under which this confession was obtained were substantially different from those surrounding the excluded confessions, hence it does not follow because other statements were excluded that this one should also be rejected. As a preliminary matter the trial judge held that it was voluntary and the evidence bearing thereon was then presented to the jury with appropriate instructions that if they did not believe the confession was free and voluntary they must disregard it. We hold that under the circumstances the trial court did not abuse its discretion in submitting to the jury the evidence as to the judicial confession.

Irrespective of which version of the roping incidents is accepted it is to be deplored that defenseless prisoners were permitted to be abused while in the custody of peace officers whose sworn duty it was to protect them. We feel that those responsible (both laymen and officers) for these unsavory incidents must bear the opprobrium of their fellowmen. Such actions within our borders cannot be condoned. Nevertheless, prosecution of the one charged with the crime cannot be stayed for such misconduct nor does it follow that any statement made thereafter by defendant should necessarily be excluded.

### Oral Argument

■ Finally, defense contends the county attorney in his closing argument to the jury was guilty of misconduct prejudicial to defendant's right to a fair and impartial trial. First, it is urged the prejudicial aspect of politics was injected when the prosecutor suggested that possibly Patrolman Selchow testified as he did in order to discredit the sheriff because the former might want to run for that office. This statement was in answer to counsel's statement that the patrolman's testimony should be accepted as true, for in testifying against a fellow officer he was doing so "at the risk of everything". We have repeatedly held that attorneys are given wide latitude in their arguments to the jury. Sage v. State, 22 Ariz. 151, 195 P. 533; State v. McLain, 74 Ariz. 132, 245 P.2d 278. We see nothing prejudicial or improper in these remarks.

The final statement of which complaint is made presents a more serious question. We quote from the transcript:

"Mr. Polley: The reason that I am asking you assess the death penalty in this case is because it is a case which deserves it. It is a deliberate premeditated dastardly murder of a woman who had a right to live. It was committed without reason, unless you can say that wanting to rob her was reason, or wanting to rape her was reason." (P. 2581.)

"Mr. Tomlinson: Now, your honor, there was nothing in here about rape. We object to that.

"The Court: That part may be stricken and the jury instructed to disregard the matter of rape. There is no evidence regarding it."

The trial court very properly instructed the jury to disregard this objectionable comment of the prosecutor. Ordinarily such action by the trial court cures the error, but such is not always the case. While we recognize the potential inflammatory tendency of any reference to rape, particularly where a white woman and a Negro are concerned, it must be pointed out that there was no evidence that any rape had been committed or attempted. As the jury well knew there was nothing to substantiate such a remark. It rested wholly in the imagination of the prosecutor and hence no jury after the court's admonition could have been swayed thereby.

We believe that the evidence is of such a nature that no reasonable jury, whether the objectionable remark had been made or not, could have returned any other verdict than guilty of murder in the first degree. The trial court was in a much better position than we to judge of the pernicious effects of such a reference. By its denial of a motion for a new trial—wherein this point was strenuously urged—the court in effect found that the statement was not so inflammatory or prejudicial as to justify the requested action. We find no abuse of discretion.

It would unduly extend this already lengthy opinion to discuss defendant's remaining assignments of error—some of which were not even argued in his brief or urged on the motion for new trial—suffice it to say that all of these have been carefully examined and considered and found to be without merit. In reading the transcript of the long drawn out trial we are impressed that the learned trial court was most careful in safeguarding the constitutional rights of the defendant. No assignments of error are predicated on the instructions given the jury as to the law governing the case.

Due to the fact that the death penalty was inflicted we have painstakingly scrutinized the entire record and we hold that defendant was accorded a fair and impartial trial and there is ample evidence to justify the verdict rendered.

Judgment affirmed.

PHELPS, C. J., and STANFORD, LA PRADE and WINDES, JJ., concur.